**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0262n.06
Filed: April 9, 2007

**No. 05-6552**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RAYMOND MOLINA,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

_____/

**BEFORE:**     MARTIN and CLAY, Circuit Judges; and POLSTER, District Judge.[*]

    **CLAY, Circuit Judge.** Defendant Raymond Molina was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). His sentence was enhanced pursuant to U. S. Sentencing Guidelines §§ 2K2.1(b)(5) and 3A1.1(b)(1) and he received a 115-month sentence. Defendant appeals the district court order denying his motion to suppress, his motion for a directed verdict, and the imposition of the §§ 2K2.1(b)(5) and 3A1.1(b)(1) enhancements. For the reasons set forth in this opinion, we **AFFIRM** the district court's order.

**BACKGROUND**

    On January 1, 2005, at or around 7:30pm, the Cleveland, Tennessee Police Department received a call from a victim of a drive-by shooting at 14th Street and Lay Street. The caller reported

_____

    [*]The Honorable Dan A. Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

that the assailant was driving a "small, black Nissan" that was occupied by the shooter, an African American man, and two passengers, an African American woman in the front passenger seat and an African-American man in the backseat. The caller also reported that the shooter fired at both him and his twelve-year-old stepson. Lieutenant Steve Tyson, a sixteen-year veteran of the Cleveland Police Department, responded immediately to the call and arrived at the scene about one minute after receiving the dispatch. Tyson spotted a small, black Nissan about four blocks from where the shooting had allegedly occurred, which was about a minute in driving time away from the location of the shooting. As the vehicle passed, Tyson could not see inside because the windows were tinted, thus he was unable to confirm the number of occupants in the vehicle or whether they matched the reported description. However, because the car matched the exact description given and the location was consistent, Tyson stopped the car.

As Tyson approached the car, Defendant exited the vehicle. The only other passenger, his wife, Samantha Bergeron, remained inside. Tyson asked Defendant for his license, which he subsequently discovered had been suspended. Tyson requested permission to search Defendant's vehicle, but Defendant refused. Tyson then placed Defendant under arrest for driving with a suspended license and placed him in the patrol car. At this point, backup police arrived and Officer Trewhitt began searching Defendant's vehicle. Trewhitt observed a firearm in plain view in Bergeron's purse. The officers apprehended the gun, handcuffed Bergeron, and began questioning her.

Bergeron told the officers that Defendant shot at the two victims with the gun. She explained that she had purchased the gun two weeks earlier for Defendant because Defendant told her they

2

needed it for protection. According to Bergeron, she, Defendant, and Defendant's friend were in the car when Defendant noticed the two victims walking down the street. Defendant was driving and when he noticed the victims, he turned the car around to follow them and turned off his lights. Defendant said to Bergeron and the other passenger, "I'm sick of these fucking white people here." (J.A. at 40). Defendant pulled up to the victims and said, "Motherfucker, do you have a problem?" (J.A. at 38). Bergeron said she heard one of the victims reply, "No, no. Hey, I got no problem." (J.A. at 38). She then heard Defendant respond, "Well, I got something for you. You're going to dance for me, motherfucker. You're going to dance for me." (J.A. at 38). Bergeron told the officers that she saw Defendant take the .22 caliber out of a hiding place in the gear shift of the car and fire it at the younger victim's chest. The gun misfired, and Bergeron told the officer that she attempted to pull the gun away from him, but he shoved her away and shot at the legs of the older victim, but he missed again. Defendant then drove away and let his friend who was seated in back of the vehicle out. Bergeron told the officers that Defendant forced her to take the gun and hide it in her purse when he noticed Tyson following the vehicle.

At trial, Bergeron testified to the same story she gave the officers when she was questioned by them on the night of the shooting. On cross-examination, however, Bergeron admitted that she had written a letter to Defendant stating that the police coerced her into stating that he had been the shooter. In that letter, she detailed a conversation between herself and the arresting officers in which she was told that she could either "make a statement as a witness, choice number one, or go to jail as a suspect, choice number two." (J.A. at 48). The letter stated that the officers made it clear that she could either implicate Defendant as the shooter or she would be charged for the crime, and that

she only did the former to avoid the latter. At trial she explained the discrepancy between that letter and her testimony by stating that she had been coerced into writing the letter by Thelma Franco, Defendant's mother. She testified that the information she had given the officers the night of the shooting, which comported with her trial testimony, was the truth and that the letter was untrue.

Tyler Cross, the twelve-year-old victim, also testified at trial. He stated that he was walking with his stepfather at around 7:30pm when a black car passed them, and then turned around and approached them with the lights off. The driver asked him if he had a problem and Cross responded that he did not. According to Cross, the driver then pulled out a gun and fired at his chest, but the gun misfired and Cross jumped into a ditch to hide. Cross heard a woman yell "stop," and the driver yelled back to "shut up" and "sit down." (J.A. at 66-67). Cross testified that he saw the driver shoot at his stepfather's legs and heard him say he was going to "make him dance or something." (J.A. at 70-71). Cross did not know if the driver was African-American; he only knew that he had "dark skin." (J.A. at 72). However, he positively identified Defendant in court as the driver and shooter and confirmed that there was a woman and another man in the car as well. When asked if there was a possibility that Defendant was not the driver, he responded that there was not.

Defendant stipulated that he was a convicted felon and that the gun used had traveled in interstate commerce. Thus, the only issue the court needed to establish was whether he possessed the firearm. Defendant moved to suppress all evidence uncovered as a result of the stop and search of his vehicle, which included the gun and Bergeron's statements, on the grounds that there was no reasonable suspicion to stop the car. The district court denied this motion and reasoned that because Tyson knew that the shots had been fired from a small, black Nissan, he had reasonable suspicion

4

to justify stopping Defendant, who was driving a small, black, Nissan. Further, the court pointed out that when he observed Defendant one minute after the shooting was reported, Defendant was only four blocks from where the shooting occurred, which was consistent with Defendant being the shooter. Given these facts, the district court held that Tyson "would have been derelict in his duty had he not stopped" Defendant. (J.A. at 28).

At the close of evidence, Defendant moved for judgment of acquittal on the grounds that the government had insufficient evidence to prove possession, which was an essential element of the felon in possession of a firearm charge. Defendant argued that the testimony of the witnesses the government had called did "not support the element of possession." (J.A. at 97). Defendant failed to elaborate any further on this argument. The court observed that, when viewing evidence in the government's favor, which it was obligated to do, it was clear that the government did prove the element of possession because both Cross and Bergeron testified that Defendant both possessed and used the gun. The court concluded that it was possible, based on the facts presented, for a reasonable jury to find that Defendant was in possession of the gun. Accordingly, the court denied Defendant's motion for judgment of acquittal.

The jury convicted Defendant and a presentence report ("PSR") was prepared to aid in sentencing. Two of Defendant's objections to the PSR are before this Court for review. First, Defendant objected to a four-level enhancement pursuant to the U.S. Sentencing Guidelines § 2K2.1(b)(5) for using a firearm "in connection with" another felony offense. Defendant argued that because the predicate offense was being a felon in possession of a firearm and the "other offense" was aggravated assault with a firearm, the two offenses were co-extensive. The government

responded that the two felonies were not co-extensive because Defendant committed the predicate felony of being a felon in possession two weeks prior to the shooting when he instructed Bergeron to purchase the gun for him. The court was persuaded by the government's argument and imposed the enhancement. Defendant additionally objected to a two-level enhancement imposed pursuant to § 3A1.1(b)(1), which enhances the sentence because one of the victims was a minor. Defendant objected to this enhancement and argued that he did not know or have any reason to know that the victim was a minor. Because it was dark the night of the shooting and because Cross was "rather a large child," Defendant argued that he had no reason to suspect that Cross was a minor. (J.A. at 110). The court was unpersuaded by this argument as well. The court held that while he may have been large for a twelve-year-old, there was no way he could be mistaken for an eighteen-year-old. Especially because, as the judge pointed out, Defendant heard Cross speak. The judge reasoned that because Cross' voice had not yet changed, his voice "is nothing at all like the voice of a man." (J.A. at 111). Thus, the court concluded that this non-visual indicator of Cross' youth should have made Defendant aware that he was a child, and therefore the court imposed the enhancement. Defendant was sentenced to 115 months imprisonment, which was the maximum sentence under the Guidelines. Defendant filed timely a notice of appeal.

## DISCUSSION

### I.    The district court properly denied Defendant's motion to suppress.

#### A.    Standard of Review

"In an appeal of the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. Hudson*, 405 F.3d 425,

431 (6th Cir. 2005); *see also United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999). Thus, while we will review the determination of the ultimate question of whether there was reasonable suspicion *de novo*, we must afford due weight to the factual inferences and credibility determinations made by the district court. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)

### B.      Analysis

According to this Court, *Terry v. Ohio* applies to the investigative stop of vehicles and allows that "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) (citing *Terry* 392 U.S. *v. Ohio*, 392 U.S. 1, 31 (1968)).  We have previously summarized the law concerning what constitutes reasonable suspicion to justify an investigative stop:

> An investigative detention is permissible when it is based upon "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the individual is, was, or is about to be engaged in criminal activity. . . . In reviewing a challenged investigative stop, "the totality of the circumstances–the whole picture–must be taken into account". . . . Furthermore, "in assessing the reasonableness of the stop, the facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?'"

*United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (quoting *United States v. Barrett*, 890 F.2d 855, 860 (6th Cir. 1989) (citations omitted).  The determination is made "in light of the totality of the circumstances." *Caruthers*, 458 F.3d at 465, and requires the officers to "have a particularized

and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Our holding in *Hurst* is instructive here. In that case, a victim of an armed burglary reported that his assailants were driving a "dark-colored Thunderbird" with a damaged grill and that there were two people in the vehicle. *Hurst*, 228 F.3d at 755. The police stopped the defendant twenty-five minutes in driving time from the victim's residence, which was consistent with the reported time of the robbery. *Id*. The defendant was in a dark blue Mercury Cougar, which was "similar in appearance to a Thunderbird." *Id*. The grill of the car was missing, but the defendant's car was occupied by himself and only one other passenger, which means there were two people in the vehicle instead of the reported three. *Id*. Despite these differences between the report and the facts the police observed when the defendant was stopped, we held that there was reasonable suspicion. *Id*. at 757. Importantly, we reasoned that because the description "roughly" matched the description of defendant's car and because the car was observed at a "location consistent with the time needed to travel from [the victim's] residence," the officer "had knowledge of specific and articulable facts, which, taken together with reasonable inferences, certainly gave rise to reasonable suspicion of criminal activity." *Id*. We were not swayed by the fact that the car had two occupants instead of three because, as we reasoned, there are a number of explanations that could account for such a minor discrepancy. *Id*. We thus concluded that reasonable suspicion existed with those facts.

The present case is quite similar to *Hurst*. Tyson observed Defendant's vehicle, which matched the color and make of the car for which Tyson was looking. Further, precious little time had elapsed between the shooting and Tyson spotting Defendant, and he was spotted in a location

consistent with him being the shooter. Observing a vehicle that matched the exact description and location of the car in question "certainly gave rise to reasonable suspicion of criminal activity." *Hurst*, 228 F.3d at 757. While Tyson was unable to see into the car, Defendant does not focus on this fact. Defendant's sole argument is that Tyson lacked a "particularized and objective basis" for stopping Defendant, which was required by *Cortez*, 449 U.S. at 417-18.

Defendant argues that because the two characteristics that were used to describe his vehicle, "black" and "Nissan" are very common characteristics, and therefore are not particularized. However, in *Cortez*, the Court did not use the word "particularized" to mean characteristics that are necessarily uncommon, but instead to refer to characteristics that are specific and that will, viewed in their entirety, "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U.S. at 418-19. Black cars are certainly common, as are small ones and as are Nissans. However, all of these descriptors taken together and viewed in the totality of the circumstances with the location of the car being consistent with the location of the shooting create a particularized basis giving rise to reasonable suspicion. Thus, we conclude that there was reasonable suspicion that justified the initial stop.

## II. The district court properly denied Defendant's motion for judgment of acquittal

### A. Standard of Review

We review *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004). In the instant case, Defendant claimed he was entitled to judgment as a matter of law because there was insufficient evidence to support his conviction. In order for a conviction to be supported by sufficient evidence, "when viewing the

evidence in the light most favorable to the prosecution," it must be possible for some rational trier of fact to "have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In deciding this, this Court must refrain from "weigh[ing] the evidence, mak[ing] credibility determinations, or substitut[ing] [its] judgment for the jury's verdict." *United States v. Crossley*, 224 F.3d 847, 855 (6th Cir. 2000).

### B.     Analysis

The sufficiency of the evidence claim standard should be applied "with explicit reference to the substantive elements of the criminal offense." *Jackson*, 443 U.S. at 324 n.16. Thus, this Court must consider the essential elements of the offense of being a felon in possession of a firearm, § 922(g)(1). Because Defendant stipulated that he is a convicted felon and that the firearm in question traveled in interstate commerce, the only question remaining before this Court is whether there was sufficient evidence that Defendant was in possession of a firearm.

#### 1.     Possession Element

In determining whether a person is in possession of a firearm in violation of § 922(g)(1), the government may present evidence of either actual or constructive possession. *United States v. Moreno*, 933 F.2d 362, 373 (6th Cir. 1991). "Actual possession exists when a tangible object is in the immediate possession or control of the party." *United States v. Beverly*, 750 F.2d 34, 37 (6th Cir. 1984) (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (1973)). Because the gun was found in Bergeron's possession, the government cannot proceed under a theory of actual possession. "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an

object, either directly or through others." *Craven*, 478 F.2d at 1333. This Court has consistently held that the testimony of other occupants in the vehicle where the defendant used a firearm is sufficient to support a finding that the defendant was in constructive possession of that firearm. *See, e.g., United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004); *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003); *United States v. Daniel*, 134 F.3d 1259, 1264 (6th Cir. 1998). Accordingly, Bergeron's testimony that Defendant possessed and used the gun was sufficient such that a rational trier of fact could have found, as the jury did, that Defendant had constructive possession of the gun that was found in Bergeron's purse.

With respect to this issue, Defendant relies entirely upon our holding in *United States v. Arnold*, 434 F.3d 396 (6th Cir. 2006), *vacated, United States v. Arnold*, 2006 U.S. App. LEXIS 4995 (6th Cir. 2006). That case has been vacated and reheard *en banc*, thus, reliance on that case is inappropriate.

As Defendant pointed out in oral argument, there are some questions of credibility with respect to Bergeron's credibility. First, at trial she admitted that she had contradicted her testimony in a letter that she had written to Defendant stating that she only implicated him as the shooter because the officers threatened to arrest her if she did not. Additionally, as Defendant argues, because Bergeron had actual possession of the gun when the officers found it, she undeniably benefitted from testimony attributing possession to Defendant. However, these arguments are essentially arguments that Bergeron was not a credible witness, which is not within the province of this Court to decide on a sufficiency of the evidence claim. As we have explicitly held, we "must not weigh the evidence, evaluate witness credibility, or displace the jury's judgment with our own."

11

*United States v. Wagner*, 382 F.3d 598, 610-11 (6th Cir. 2004). Sufficient evidence exists where "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Blood*, 435 F.3d 612, 618 (6th Cir. 2006) (internal quotation marks and citation omitted). Thus, we cannot entertain an argument that amounts to the contention that the jury should not have believed a witness. Accordingly, the district court properly denied Defendant's motion for judgment of acquittal.

**III.    The district court properly applied §§ 2K2.1(b)(5) and 3A1.1(b)(1) enhancements to Defendant's sentence**

**A.    Standard of Review**

We have held that the question of whether an enhancement was properly applied is a mixed question of law and fact. While we "[w]e review for clear error the district court's factual findings, and accord 'due deference' to the district court's determination that the . . . enhancement applies," *United States v. Burke*, 345 F.3d 416, 426-27 (6th Cir. 2003), we review the legal conclusions of the district court *de novo*. *U.S. v. Layne*, 324 F.3d 464, 468 (6th Cir. 2003).

**B.    Analysis**

**1.    § 2K2.1(b)(5)**

Section 2K2.1(b)(5) states: "If the defendant used or possessed any firearm or ammunition in connection with another felony offense . . . increase by 4 levels." We have adopted the general rule of the Eighth Circuit that the "in connection with" requirement of § 2K2.1(b)(5) "should be construed as equivalent to the "in relation to" language of 18 U.S.C. § 924(c)." *United States v. Hardin*, 248 F.3d 489, 497 (6th Cir. 2001) (quoting *United States v. Regans*, 125 F.3d 685, 686 (8th Cir. 1997)). According to Defendant's PSR, this enhancement was imposed because Defendant

"used the firearm in connection with an aggravated assault on Mr. Matthews [Cross' step-father] and [Cross]" and because he "assaulted his wife and forced her to conceal the gun."[1] Defendant argues that the requirement that he use or possess a firearm with "another felony offense" must be satisfied by an offense that is entirely distinct and separate from the possession of the gun.

As Defendant correctly observes, we have consistently held that the imposition of this enhancement requires a "finding of a separation of time between the offense of conviction and the other felony offense, or a distinction of conduct between that occurring in the offense of conviction and the other felony offense." *United States v. Sanders*, 162 F.3d 396, 400 (6th Cir. 1998). However, as the district court correctly held, Bergeron testified that she purchased the gun because Defendant instructed her to do so two weeks prior to the shooting . We have held that possession may occur when a person has the power to exercise dominion or control over an object either "directly or through" another person. *United States v. Newsom*, 452 F.3d 593, 608 (6th Cir. 2006). Further, Bergeron testified that they both knew where the gun was located and that the last time she saw the gun, it was in the house in a cabinet, which indicates that Defendant exercised dominion and control over the gun and placed it in the car. Thus, the factual finding of the district court was that Defendant was in possession of the gun two weeks prior to the shooting, which is not a clearly erroneous finding given Bergeron's testimony. Interestingly, Defendant does not respond to this

---

[1]Defendant makes an extremely cursory alternative argument that "shoving a gun" at his wife does not rise to the level of assault where "there is no evidence that he either touched her with the gun or caused her to be afraid." (Def.'s Brief at 17). This argument is flawed because according to Bergeron's testimony, Defendant "shoved her off with the gun." Thus, there is evidence that he touched her and that he did so with a gun in his hand, which absolutely rises to the level of assault. (J.A. at 38).

argument at all, and instead, devotes significant time to the general argument that the two offenses cannot be co-extensive. While Defendant's argument is correct as a matter of law, it does not deal with the specific fact that in this case there is evidence that Defendant possessed the gun prior to the shooting. We conclude that the district court properly applied the § 2K2.1(b)(5) enhancement to Defendant's sentence.

### 2.    § 3A1.1(b)(1)

Section 3A1.1(b)(1) provides that "if the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." The Guidelines define a vulnerable victim as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." U.S. Sentencing Guidelines § 3A1.1, cmt. n.2 (2003).

Defendant's argument is extremely cursory and consists only of two sentences stating that because it was dark and Cross was large for his age, there was no way for him to have known that he was a minor. However, as the district court held, a child being large for a twelve-year-old does not mean he can reasonably be mistaken for an eighteen-year-old. The court further reasoned that Defendant addressed Cross and Cross spoke back to Defendant. The judge pointed out that he had heard Cross speak and his voice, "is nothing at all like the voice of a man" and, thus, Defendant was well on notice that Cross was a child. (J.A. at 111). This is a factual determination that the district court is substantially better equipped to make than we are, and, accordingly, we will accord its

finding due deference.  Because this is not a clearly erroneous finding, we conclude that the district court properly applied the § 3A1.1(b)(1) enhancement to Defendant's sentence.

## CONCLUSION

For the forgoing reasons, we **AFFIRM** Defendant's conviction and sentence.