NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0006n.06

Case No. 22-3571

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 04, 2024
KELLY L. STEPHENS, Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JAMES GORDEN,

      Defendant - Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

---

Before: GIBBONS, BUSH, and DAVIS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. James Gorden moved to suppress evidence found on him during an encounter with Akron Metropolitan Housing Authority ("AMHA") officers in an apartment complex parking lot. The district court denied the motion, finding reasonable suspicion to justify the officers' stop and frisk of Gorden based on an open container violation and two 911 calls in the area. Gorden appealed this denial. Because the district court did not err in finding the existence of reasonable suspicion to support the stop and frisk, we affirm.

I.

On the night of March 4, 2020, Officer Justin Ingham, an off-duty Akron police officer, worked his shift as a part-time AMHA officer. Shortly before 8:00 p.m., police dispatch alerted Ingham and his partner to a 911 call concerning "a fight with a weapon" at 2 Cicero Plaza, Akron, Ohio. DE 64, Mot. To Suppress Hr'g Tr., Page ID 315; DE 67-1, Police Incident Report, Page ID 380. The caller identified the apartment as his niece's, and he claimed that his niece's boyfriend, a man named Harry, was "waving a gun around" and refusing to leave the apartment. DE 67-1,

Police Incident Report, Page ID 380. The caller also reported that his two nieces and a small child were in the apartment, although the caller himself was not believed to be present at the time. Less than five minutes later, a neighbor called 911 to report a Black male with a gun, yelling and walking back and forth in the parking lot adjoining Cicero Plaza. The caller described the man as wearing a hat, dark coat, and light pants. Dispatch informed Ingham and his partner of these facts before they arrived on the scene.

Upon arrival, the officers witnessed a group of two men and two women "arguing or having a heated conversation" in the parking lot. DE 64, Mot. To Suppress Hr'g Tr., Page ID 322. The two men, including Gorden, began walking away when the officers arrived. One woman in the group identified Gorden as "the one causing the trouble."[1] *Id.* Gorden, a Black man, wore a stocking cap, dark coat, and "faded camouflage pants" that, to Ingham, "appeared light in the parking lot light." *Id.* at 323. Ingham observed that Gorden "matched the description given" by the 911 caller. *Id.* at 322. At the time, Gorden also held an open beer bottle.

Suspecting that Gorden was the man that officers "received the multiple calls on," Ingham ordered the two men to stop walking. *Id.* at 324–25. When the men about-faced, Ingham approached Gorden, grabbed his free arm, and attempted to conduct a pat-down. Gorden resisted, and a second officer grabbed Gorden's other arm. While the officers struggled with Gorden, his jacket and shirt shifted, revealing a handgun in his waistband. Officers arrested Gorden upon seeing the gun, and a subsequent search revealed a handgun, five rounds of loose ammunition, 12.5 grams of cocaine, 0.8 grams of crack cocaine, and other substances including methamphetamine and fentanyl.

---

[1] This woman, unknown to officers before the arrest, appears to have been Samantha Tanner, one of the nieces identified in the first 911 call.

A grand jury returned charges of possession with intent to distribute controlled substances, being a felon in possession of a firearm, and possession of a firearm in furtherance of a drug trafficking offense. Gorden filed a motion to suppress the evidence discovered during the stop, which the district court denied after an evidentiary hearing. As to the stop, the district court found that Gorden conceded reasonable suspicion based on his possession of an open container. As to the frisk, the district court determined that the circumstances would lead a reasonable officer to feel "concerned about his safety." DE 64, Mot. To Suppress Hr'g Tr., Page ID 365–67. The district court highlighted the aspects of Gorden's appearance that matched the description of the subject of the 911 calls, noting Gorden's race, "dark hat, . . . dark coat[,] . . . [and] faded camouflage pants, which if you had to describe them, they're more light than dark." *Id.* at 366. The district court also noted the woman on the scene identifying Gorden as "the person causing trouble." *Id.* These identifying features, plus the alleged involvement of a gun, the district court concluded, would lead a prudent officer to conduct a pat-down.

Gorden pled guilty to all three counts while reserving the right to appeal the denial of his motion to suppress. The district court sentenced Gorden to 106 months' imprisonment followed by three years of supervised release. Gorden filed a timely notice of appeal.

**II.**

In reviewing the denial of a motion to suppress, the district court's factual findings are reviewed for clear error, and its legal conclusions are reviewed de novo. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016) (citing *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007)). The existence of reasonable suspicion to justify a stop or frisk is a mixed question of law and fact, which we also review de novo. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Such evidence must be viewed "in the light most likely to support the district court's

opinion." *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)).

The Fourth Amendment permits officers to, without a warrant, stop and temporarily detain an individual when the "officer has reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *United States v. Atchley*, 474 F.3d 840, 847–48 (6th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)). While an officer must have more than a hunch, reasonable suspicion requires less than probable cause and "considerably less than proof of wrongdoing by a preponderance of the evidence." *Alabama v. White*, 496 U.S. 325, 330 (1990) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The determination requires that the court consider the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). During a stop, an officer may "conduct 'a reasonable search for weapons for [his or her] protection . . . where he [or she] has reason to believe that he [or she] is dealing with an armed and dangerous individual.'" *United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

### III.

At the outset, Gorden's possession of an open container of alcohol supplied officers with the requisite reasonable suspicion to justify the stop. The parties agree that Ingham observed Gorden with "an open beer bottle in his open right hand." DE 64, Mot. To Suppress Hr'g Tr., Page ID 323. The parties further agree that this likely constituted a state misdemeanor.[2] The undisputed observation of the open beer bottle would therefore "warrant a man of reasonable caution in the belief that an offense . . . [was] being committed." *United States v. Gross*, 550 F.3d

---

[2] The parties' supposition during the suppression hearing finds support in the Ohio Code, as state law at the time of the stop prohibited possession of an "opened container of beer" in public. OHIO REV. CODE ANN. § 4301.62 (effective July 3, 2019 to Oct. 12, 2020).

578, 583 (6th Cir. 2008) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (noting the standard for probable cause)). And because Ingham's observation of the open container thus supplied him with probable cause to arrest Gorden, it follows that the observation also generated grounds to initiate a *Terry* stop given the lower threshold for reasonable suspicion. That Ingham may have subjectively initiated the stop because he believed Gorden to be the subject of the 911 calls is immaterial to the reasonable suspicion determination. *See Whren v. United States*, 517 U.S. 806, 814 (1996) (rejecting the argument that "the constitutional reasonableness of a traffic stop depends on the actual motivations of the individual officers involved").

Because the scope of a *Terry* stop must be reasonably tethered to its justification, however, the open container violation alone fails to provide reasonable suspicion of dangerousness to justify a frisk. *See United States v. Wilson*, 506 F.3d 488, 495–96 (6th Cir. 2007) (traffic stop based on observed seatbelt infraction did not justify pat-down of the passenger absent additional facts generating suspicion that individual was armed and dangerous). But the 911 calls and details corroborated on the scene did provide articulable facts that would warrant a reasonable officer to conclude that Gorden was the individual described in the calls as agitated and brandishing a weapon and thus: (1) involved in criminal activity; and (2) armed and dangerous. Accordingly, these 911 calls supplied a sufficient independent basis for both the stop and the frisk, and Gorden's attack on the particularity and reliability of the calls falls flat.

*Particularity.* Gorden first contends that the 911 calls did not provide a "particularized reason" to stop and search him as opposed to the three other individuals in the parking lot. CA6 R. 43, Appellant Br., at 13–14. But Gorden was the only individual that matched the physical description provided in one of the 911 calls. Police dispatch put officers on alert for a Black man wearing a hat, dark coat, and light pants, yelling in the apartment parking lot. Upon arriving at the

scene, officers first observed two males and two females engaged in an argument, corroborating the alleged dispute described in both calls. As a Black man wearing a cap, dark coat, and faded camouflage pants, Gorden also closely fit the call description. The other male in the group, in contrast, was a Caucasian man wearing a T-shirt. Further, an individual on the scene identified Gorden as "the one causing the trouble." DE 64, Mot. To Suppress Hr'g Tr., Page ID 322.

Although the first caller identified the armed man as someone named "Harry," and the second caller reported the man to have light pants, while Gorden wore camouflage, these are "discrepanc[ies] that might reasonably be explained in any number of ways and do[] not defeat the assessment" of reasonable suspicion. *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000); *cf. United States v. Jackson*, 188 F. App'x 403, 409 (6th Cir. 2006) (finding a lack of reasonable suspicion where officers "stopped a car that was a different make and model from that being sought, traveling in the wrong direction, and that was driven by an individual who did not match the physical description of the suspect"). Indeed, Ingham's testimony that Gorden's pants "appeared light in the parking lot light," and Gorden's own description of his pants as "faded" undermines the discrepancy between the call description and Gorden's appearance. DE 64, Mot. To Suppress Hr'g Tr., Page ID 323; CA6 R. 43, Appellant Br., at 8.

This case fits comfortably within this circuit's case law finding reasonable suspicion based on physical descriptions of suspects provided to officers. In *Hurst*, an officer responded to a report of a burglary in which the victim reported seeing two people in a dark-colored Thunderbird with a damaged grill in his driveway shortly before discovering the crime. 228 F.3d at 755, 757. After seeing a car roughly matching the description, but with three occupants instead of two, in the vicinity of the crime scene, the officer conducted a stop. The court found that the officer's observation of Hurst's vehicle, roughly matching the distinctive description given to the police

and in a location consistent with the burglary, consisted of "specific and articulable facts, which, taken together with reasonable inferences, certainly gave rise to reasonable suspicion of criminal activity," despite the inconsistency in number of occupants and exact model of the vehicle. *Id.* at 757. While the description in *Hurst* contemplated a distinctive model of car, "[i]t is not necessary for the characteristics to be uncommon or especially unique in order to be particularized." *United States v. McCauley*, 548 F.3d 440, 444 (6th Cir. 2008); *United States v. Molina*, 226 F. App'x 523, 528 (6th Cir. 2007) (finding reasonable suspicion sufficient to initiate a traffic stop based on a report of a "small, black Nissan" involved in a shooting in the immediate vicinity).

Similarly in *McCauley*, the court found reasonable suspicion based on a robbery victim's description of the perpetrator as a Black man driving a black SUV, whom she knew to live on Riverside Drive, when police observed a matching individual driving a black SUV towards a residence on that street. 548 F.3d at 444. The suspect's failure to pull over when police activated their overhead lights, considered alongside the matching vehicle description and corroborating location, provided officers with reasonable suspicion to justify seizing McCauley in his driveway. *Id.* at 444–46. Here, the analysis mirrors *Hurst* and *McCauley*: specific facts alleged in the 911 calls and corroborated at the scene—such as the location, Gorden's participation in an argument, and his largely matching physical appearance—provided support for the inference that Gorden was the agitated, armed subject of the 911 calls. While it may have been prudent for Ingham to obtain more information about the situation or Gorden's identity before attempting a pat-down, the law did not require him to do so.

***Reliability.*** Gorden next argues that the 911 calls were not reliable. Indeed, "[w]here an informant tip, rather than police observation, is the basis of an investigatory stop, the tip must exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory

stop.'" *Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (finding that a completely anonymous, although detailed, tip failed to provide sufficient indicia of reliability to generate reasonable suspicion)). The caller's "veracity, reliability, and basis of knowledge are highly relevant to the analysis." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

The two 911 calls, corroborated by details observed on the scene, bear sufficient indicia of reliability to support a finding of reasonable suspicion. First, the two callers were not anonymous tipsters. Although the record is not entirely clear on the timing, the officers became aware of the callers' identities at some point. Further, the first caller reported a familial connection to the occupants of 2 Cicero Plaza—his nieces. This connection to the occupants lends "an indicium of reliability" to the allegations of a dispute involving a weapon. *Robinson*, 663 F.3d at 829 (noting that although the caller did not claim to live at the reported address or provide any connection to it, the identification of a specific address adds to the reliability of the call). The second call then bolstered the reliability of the first call, as it followed closely thereafter and similarly reported an agitated man with a gun in the immediate vicinity. This second call, which contained a more detailed physical description of the armed man, was made by a neighbor, demonstrating "[f]irsthand knowledge and contemporaneity" that "weigh in favor of [the] statement's reliability." *Robinson*, 663 F.3d at 829–30.

Taken together, the fact that the 911 calls were made in close temporal proximity and both reported an agitated man showing a gun in and around the same apartment complex, coupled with Gorden's largely matching physical appearance, his participation in an argument in the same parking lot, and a witness's identification of Gorden as causing problems, would lead a reasonably prudent officer to believe both that Gorden was the individual identified in the 911 calls as agitated

and misusing a firearm, and that Gorden was armed and potentially dangerous.[3] The district court accordingly had ample grounds to find reasonable suspicion to support both the stop and the frisk of Gorden.

## IV.

For the aforementioned reasons, the panel affirms the district court's findings below.

---

[3] Although the government also requested that the court view the district court's finding of reasonable suspicion for the stop as an invited error, reviewable only in exceptional circumstances, our determination that the district court did not in fact err obviates the need for this inquiry.