# United States Court of Appeals
## For the First Circuit

No. 10-1092

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFREY MARTIN WALKER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Selya and Lipez, Circuit Judges.

Jonathan Shapiro, with whom Alexandra Deal and Stern, Shapiro, Weissberg & Garin, LLP were on brief, for appellant.
Marshal D. Morgan, Assistant United States Attorney, with whom Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson Pérez-Sosa and Luke Cass, Assistant United States Attorneys, were on brief, for appellee.

November 23, 2011

**SELYA**, **Circuit Judge**. A jury convicted defendant-appellant Jeffrey Martin Walker on charges of interstate stalking, cyberstalking, and mailing a threatening communication. On appeal, he challenges both the verdict and the ensuing sentence, presenting (among other issues) three questions of first impression in this circuit. Two of these questions involve statutory interpretation and the third involves the operation of Federal Rule of Criminal Procedure 12(e). After careful consideration of compendious briefing and well-marshaled arguments, we reject the appeal.

## I. BACKGROUND

We rehearse the facts in the light most agreeable to the verdict, consistent with record support. United States v. Stevens, 640 F.3d 48, 49 (1st Cir. 2011).

The appellant and his wife, Amy Walker, lived together with their pre-teen son, A.M.W., until their relationship soured. As with many such tales, there is an element of "he said, she said" regarding the cause of the discord. Amy says that the appellant had been physically and emotionally abusive; the appellant says that the marriage went downhill once the couple moved from Michigan to Puerto Rico so that Amy could accept a position as a court reporter.

The family moved to Puerto Rico in 2006, and Amy left the marital domicile in August of 2007. For the first few months after the separation, A.M.W. lived with his father in Puerto Rico. In

December 2007, Amy repaired to the Puerto Rico family court, complaining that the appellant had prevented her from having any contact with her son and, in the bargain, was threatening to take the boy back to Michigan. Responding to Amy's entreaty, the family court barred the appellant from taking A.M.W. out of Puerto Rico.

The appellant defied the court's order and returned to Michigan with A.M.W. The court ordered him to bring the boy back. When he ignored that decree, the court found him in contempt and issued a warrant for his arrest. Meanwhile, the appellant obtained a temporary custody order from a Michigan court.

As the rift between the spouses deepened, Amy began receiving harassing and threatening e-mails. These communiqués were laced with derogations such as "whore" and "bitch" and contained threats to harm Amy if she continued her battle for custody.[1] Although the e-mails originated from A.M.W.'s e-mail account, A.M.W. testified that his father had composed them. Amy corroborated this identification, testifying that she inferred the appellant's authorship from certain habitual misspellings and turns of phrase.

---

[1] A few selected passages suffice to illuminate the general tenor of these e-mails. From March 28, 2008: "I will take care of you the day I am forced to come there." From March 29, 2008: "If you get hurt it will be your own fault." From April 1, 2008: "I will make you pay." From April 4, 2008: "I have to shoot you to get you to stop. I don't want to shoot you but you are not leaving me any choice . . . I can take away what you are fighting for."

Around this same time, the appellant threatened to "blow [A.M.W.'s] head off" with a shotgun. The appellant's brother, Jack, heard the threat and called the police. Alarmed by this development, Amy flew to Michigan and succeeded in obtaining a custody order from the court there. The Michigan court allowed Amy and her son to reside in Puerto Rico after Amy's supervisor at work, Chief Judge José Fusté of the United States District Court for the District of Puerto Rico, offered assurances that Amy would return to Michigan should subsequent proceedings require her presence.

Amy's return to Puerto Rico did not allay her trepidation. To keep tabs on her estranged husband's whereabouts, Amy surreptitiously used her knowledge of his password to monitor his e-mails. In this way, she learned that the appellant had contacted a militaristic website asking for pointers on wielding a knife in close combat. She also learned that the appellant had asked the author of a religious tome whether a man could commit premeditated murder and still be saved. Amy testified that these communications exacerbated her fears that the appellant intended to kill her and her young son.

Other actions during this period demonstrated the appellant's increasing desperation. For example, in the spring of 2008, he engaged in an extended correspondence with a private investigator in Puerto Rico. Although the appellant never hired

the man, the relevant e-mails make it plain that the appellant wanted help in learning where his wife and son were living. In April, the appellant telephoned Amy's sister and described in gruesome detail how he would murder both his wife and his son if he lost the ongoing custody battle. Amy's sister related the threat to Amy. That summer, the appellant engaged in a long online chat with a counselor at New Hope ministries, a Christian counseling center. During this chat, he expressed his resolve to harm Amy and stated that he could have her killed for "a few hundred dollars."

On the day before he made these statements, the appellant had purchased a one-way airline ticket to Puerto Rico. Upon viewing the appellant's planned itinerary in his in-box, Amy became frightened and contacted the authorities. On the day of the flight to Puerto Rico — August 23, 2008 — agents of the Federal Bureau of Investigation (FBI) greeted the appellant at the Luis Muñoz Marín International Airport, arrested him as he deplaned, and charged him with criminal contempt (for defying the earlier orders of the Puerto Rico family court). In due course, the appellant received a ninety-day prison sentence.

While incarcerated, the appellant composed a letter to Amy, exhorting her to pray lest God harm her or A.M.W. Given the rancorous background of their relationship, Amy interpreted the appellant's jumbled prose as a threat. The appellant also wrote to one Tony Walker (a friend, but not a relative) about a fellow

inmate's offer to kill Amy for him. In that letter, the appellant stated that he did not "know if [he] said yes to [the fellow inmate] or not." The appellant also wrote that "[i]f a man or woman would have done what my wife and brother did to me, I would have killed them." Tony viewed these comments as constituting a threat on Amy's life and informed her of them.

Before the criminal contempt sentence expired, a federal grand jury sitting in the District of Puerto Rico returned an indictment against the appellant. The indictment charged him with one count of interstate stalking, ten counts of cyberstalking (each count emanating from a particular communication), and two counts of mailing threatening letters. See 18 U.S.C. §§ 2261A(1)-(2), 876(c). After a twelve-day trial, a jury convicted the appellant on the interstate stalking count, four cyberstalking counts, and one "threatening letter" count. It acquitted him on the remaining counts.

The district court denied the appellant's motion for acquittal, Fed. R. Crim. P. 29, and imposed a 137-month incarcerative sentence. This timely appeal ensued. In it, the appellant is ably represented by new counsel.

## II. ANALYSIS

The appellant musters a long list of remonstrances. We address below each of the various elements of this asseverational array.

## A. **Venue**.

The appellant's first contention is that the district court committed reversible error when it denied his pretrial motion for a change of venue. The crux of this contention is that it was unfair to try him in the same courthouse where Amy worked as a court reporter. He muses that the jurors may have given extra credence to Amy's testimony because of her position and because of testimony that Judge Fusté (then the chief judge of Puerto Rico's federal district court) had "vouched" for Amy in the Michigan custody proceedings and had encouraged her to contact the FBI when she learned of the appellant's planned trip to Puerto Rico.[2] Based on these atmospherics, the appellant maintains that his motion to change venue should have been granted and the case transferred to, and tried in, some other district.

We review a district court's denial of a motion for a change of venue for abuse of discretion. See United States v. Pérez-González, 445 F.3d 39, 46 (1st Cir. 2006). An abuse of discretion occurs "when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded

---

[2] The appellant claims, in a conclusory fashion, that the trial judge was predisposed to rule against him and repeatedly did so because of that bias. In a footnote to his brief, he argues that these erroneous rulings provide an independent basis for reversal. Appellant's Br. at 12 n.7. But the appellant has failed to develop any argument as to why these rulings were in error. Consequently, we deem this claim abandoned. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." United States v. Nguyen, 542 F.3d 275, 281 (1st Cir. 2008).  Within this rubric, a material error of law is invariably an abuse of discretion.  United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998).

Venue requirements for criminal cases are set by statute. See 18 U.S.C. §§ 3232-3244; see also U.S. Const. amend. VI.  Where, as here, those requirements are satisfied, the choice of venue is in the first instance a matter of prosecutorial discretion.  The district court, however, may overrule that choice in certain narrowly circumscribed circumstances.  As a general rule, a court must transfer a case to another district if an unacceptable level of prejudice against the defendant is likely to mar a trial in the original district.  Fed. R. Crim. P. 21(a).  This requires prejudice so great that the defendant cannot receive a fair trial. Id.  A court also may transfer a criminal case to another district "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  Fed. R. Crim. P. 21(b).

The appellant's initial claim implicates Rule 21(a) — the mandatory transfer provision.  This provision has been applied almost exclusively in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point.  See, e.g., United States v. Angiulo, 497 F.2d 440, 440-42

(1st Cir. 1974) (per curiam).  Here, however, there is no hint either that the contretemps between Amy and the appellant had captured the attention of the wider community or that pretrial publicity had tainted the jury pool.  Instead, the appellant seeks to extend the mandatory transfer provision to cases, like this one, in which the putative victim of a charged crime is an employee of the court.

To the extent that the appellant invites us to forge a per se rule, we decline his invitation.  The mere fact that the victim of the crime is a court employee in the district is not, in and of itself, a reason sufficient to compel a transfer of venue. See, e.g., United States v. Angelus, 258 F. App'x 840, 842-44 (6th Cir. 2007) (upholding denial of motion to transfer venue where victim was a Deputy U.S. Marshal who worked in district).

The appellant's citation to the decision in United States v. Wright, 603 F. Supp. 2d 506 (E.D.N.Y. 2009), does not sully this conclusion.  Wright is readily distinguishable: the crimes charged there occurred in court and court personnel were to be called as witnesses.  See id. at 508.  Nor does the appellant's invocation of Supreme Court precedents, see, e.g., United States v. Young, 470 U.S. 1, 18-19 (1985); Turner v. Louisiana, 379 U.S. 466, 473-74 (1965), assist his cause.  These cases stand for general principles with which we agree, but they have no specific application here.

The appellant tries a variation on this theme. He says that Amy's status as a court employee, coupled with the testimony about the chief judge's intervention and ongoing advice, biased the jury against him. But this case was not about the chief judge, who neither presided over the trial nor appeared as a witness. Refined to bare essence, the claim of jury prejudice is composed entirely of speculation and surmise. See Pérez-González, 445 F.3d at 46 (denying change of venue where record contained no hard evidence of jury prejudice). In idiosyncratic situations like this one, it is the trial judge's informed discretion, not the view from a more remote appellate perch, that must control. Cf. United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (noting the trial judge's "hands-on familiarity with the nuances of the case — nuances which may not survive transplantation into a cold appellate record").

We add a coda. Any concerns about an artificial inflation of Amy's credibility due to either her position at the courthouse or her relationship with Chief Judge Fusté easily could have been addressed by cautionary instructions. Yet, the appellant never requested any such instructions. Given this omission, his conclusory complaint that the government had an unfair advantage rings hollow. Cf. Greer v. Miller, 483 U.S. 756, 764 n.5 (1987) (concluding that failure by defense counsel to request curative instruction may suggest that no error occurred).

This leaves only the appellant's claim that the district court abused its discretion by refusing to transfer the case, pursuant to Rule 21(b), "in the interest of justice." We note, however, that the appellant has not alleged that a change of venue would have convenienced the parties, the victims, or any of the witnesses. Rule 21(b) links the two requirements — convenience and the interest of justice — and when a rule lists two requirements in the conjunctive, both must be satisfied. See, e.g., United States v. Luna, 436 F.3d 312, 317 (1st Cir. 2006).

There is no point in beating a dead horse. The facts of this case plainly indicate that Puerto Rico, where the victims and several key witnesses resided, was a reasonably convenient forum for all concerned. To cinch matters, a fair trial was possible in Puerto Rico, and the jury's careful picking and choosing among the counts charged is a strong indication that the appellant received one. On this record, the interest of justice did not demand a transfer. Consequently, the district court did not abuse its discretion in refusing to move the trial out of Puerto Rico.

## B. Interstate Stalking.

We turn next to the appellant's plaint that the record does not support his interstate stalking conviction and that, therefore, the district court should have granted his motion for a judgment of acquittal on this count. See Fed. R. Crim. P. 29. We review the denial of a Rule 29 motion de novo. United States v.

Dwinells, 508 F.3d 63, 72 (1st Cir. 2007). In determining whether particular evidence is sufficient to ground a conviction, we take the facts and all reasonable inferences therefrom in the light most agreeable to the jury's verdict. United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). If, on that view, the prosecution has adduced sufficient evidence of the essential elements of the crime such that a rational jury could find the defendant guilty beyond a reasonable doubt, the insufficiency challenge fails. Id.

To prove interstate stalking, the government must show that the accused traveled in interstate or foreign commerce with the intent to kill, injure, or harass another person and that "in the course of, or as a result of, such travel," the accused placed his target in reasonable apprehension of harm to herself or a family member. 18 U.S.C. § 2261A(1). The appellant theorizes that the statute applies only when some injuring or harassing act takes place during or after the interstate travel. If this is so, he cannot be guilty of the charged crime because he was detained as soon as he landed in Puerto Rico and the government offered no proof that he did anything amiss during the course of his travel.

This is quintessentially a statutory argument, and statutory construction must begin with the words of the statute itself. United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987). Here, the language of the relevant statute contradicts the appellant's theory.

-12-

The interstate stalking statute proscribes interstate travel with malicious intent when "in the course of, or as a result of," that travel, the defendant places his intended victim in reasonable apprehension of harm. 18 U.S.C. § 2261A(1). By employing the disjunctive ("in the course of, or as a result of"), Congress criminalized two types of acts. Cf. Reiter v. Sonotone Corp., 442 U.S. 330, 338-39 (1979) (discussing effect of legislature's use of disjunctive). The first type encompasses acts occurring "in the course of" the specified travel that place the target in fear of harm. The second type occurs when the interstate travel itself, viewed in the historical perspective of previous events, results in placing the target in reasonable fear of harm. The appellant's proposed construction would read this second class of prohibited conduct out of the statute, and adopting it would render nugatory the "as a result of" language. This, in turn, would flout the venerable principle that "[a]ll words and provisions of statutes" should "be given effect." United States v. Ven-Fuel, Inc., 758 F.2d 741, 751 (1st Cir. 1985). Constructions that "would render statutory words or phrases meaningless, redundant or superfluous" should be avoided. Id. at 752.

The language of the interstate stalking statute is clear and unambiguous. Taken at face value, it leads to a sensible result. The statute should, therefore, be read as written. See Cahoon v. Shelton, 647 F.3d 18, 22 (1st Cir. 2011).

-13-

Common sense supports this reading of the statute. After all, when a defendant has repeatedly threatened to harm his victims and then travels across state lines intending to inflict that harm, it would strain credulity to think that Congress meant to hold the defendant harmless until he took some further step to carry out his threat. Giving the statute its plain meaning, we hold that one way a defendant can engage in interstate stalking is by traveling across state lines with the intent to harm or harass another and, as a result of that travel, placing the target of his malevolence in reasonable fear of harm.[3]

Once we have settled upon the proper construction of section 2261A(1), the conclusion is inescapable that the evidence suffices to support the interstate stalking conviction. The appellant obviously engaged in interstate travel when he journeyed from Michigan to Puerto Rico.[4] Moreover, the record reveals a number of pre-travel e-mails that can reasonably be regarded as threats against Amy and A.M.W. That the putative victims had a reasonable basis for apprehension is manifest.

---

[3] The appellant's citation to United States v. Helem, 186 F.3d 449 (4th Cir. 1999), does not undermine this reasoning. While dictum there suggests that interstate stalking requires some actus reus during or after interstate travel, id. at 454, that court was interpreting a different statute. See id. at 451 (interpreting interstate domestic violence act, 18 U.S.C. § 2261(a)(2)). In all events, the court's dictum appears in a single sentence unaccompanied by any reasoning and is not controlling.

[4] For purposes of the interstate stalking statute, Puerto Rico is the functional equivalent of a state. See 18 U.S.C. § 10.

This leaves only the matter of the appellant's intent and, given the full panoply of circumstances that preceded his flight, a rational jury reasonably could conclude — as this jury did — that the appellant traveled to Puerto Rico with the intent to harm or harass his wife and son. The motion for a judgment of acquittal was, therefore, appropriately denied.

### C. **Mailing a Threatening Letter**.

Similarly, the appellant challenges the sufficiency of the evidence undergirding his conviction for mailing a threatening letter. Because the appellant raised this claim in his Rule 29 motion for a judgment of acquittal, it engenders de novo review. Dwinells, 508 F.3d at 72.

The statute of conviction makes it a crime for a person to mail a communication "addressed to any other person and containing . . . any threat to injure the person of the addressee or of another." 18 U.S.C. § 876(c). The jury found the appellant guilty of this crime with respect to the letter that he sent to Tony Walker (described earlier). In the appellant's view, this epistle could not have triggered the statute because it did not contain threatening language and, in all events, was not mailed to the person allegedly threatened (namely, Amy). The district court rejected these arguments and so do we.

Whether a writing can fairly be construed as a threat depends on the totality of the circumstances. See United States v.

-15-

Whiffen, 121 F.3d 18, 21 (1st Cir. 1997). The question is one of fact. See United States v. Fulmer, 108 F.3d 1486, 1492 (1st Cir. 1997). In deciding whether a particular letter contains a threat, a factfinder must take the words in a real-world context and determine whether the author reasonably should have foreseen that his message would be perceived by the addressee as a threat. See United States v. Freeman, 176 F.3d 575, 578 (1st Cir. 1999). Applying these principles, we believe that the jury reasonably could have concluded that the letter in question contained a threat against Amy.

We go directly to the text of the letter, which is rife with references to killing Amy. For example, one paragraph suggests that the appellant, then incarcerated, was talking with a fellow inmate about murdering Amy. Scrutinizing this passage in light of the acrimonious marital history, we cannot second-guess the jury's determination that the appellant should have foreseen that his comments would be perceived by the recipient of the letter as a threat against Amy.[5]

---

[5] Our conclusion is not affected by the appellant's use of the phrase "Just Joking" after noting that a fellow inmate had offered to perform a "free killing." It is unclear what, if anything, the appellant may have been "joking" about — the fact of the offer? the fact that he did not recall whether he had accepted it? the fact that the killing would be without cost to him? — and at any rate it is a jury question whether the appellant reasonably could have believed that this disclaimer would cancel out his long discussion regarding Amy's murder.

The appellant's first fallback position is that the letter threatened one person (Amy) but was sent to someone else (Tony). Those facts are accurate, but the conclusion that the appellant draws from them is not.

The test under section 876(c) is not whether a communication contains a threat to the addressee. Rather, the statute criminalizes the mailing of a letter that contains a threat either to "the person of the addressee or of another." 18 U.S.C. § 876(c). As we already have explained, the jury was entitled to conclude that the letter in question contained a threat to injure Amy. No more is exigible to prove that element of the offense.[6] See, e.g., United States v. Poe, 96 F.3d 333, 333-34 (8th Cir. 1996) (upholding § 876 conviction where threat was to harm addressee's daughter); United States v. Malik, 16 F.3d 45, 47-50 (2d Cir. 1994) (upholding § 876 conviction where letter sent to trial judge threatened the author's litigation adversaries).

The appellant has a further fallback position. He argues that the letter is protected by the First Amendment. This argument is hopeless. The law is crystal clear that threats are not constitutionally protected speech. See R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992). The appellant's citation to Watts v.

---

[6] The appellant also suggests that the temporal gap between the posting of the letter and Amy's reading of it defeats this count. But when Amy actually learned of the threat is immaterial to whether the government has proven the elements of the offense.

<u>United States</u>, 394 U.S. 705, 708 (1969) (per curiam), does not reconfigure the decisional calculus. The instant letter contains none of the politically charged and hyperbolic rhetoric found protected there.

To say more on this point would be to paint the lily. The district court did not err in denying the appellant's Rule 29 motion with respect to the "threatening letter" count.

### D. **Challenges to the Indictment**.

The appellant claims for the first time on appeal that the form of the indictment reveals two fatal defects. First, he asserts that the interstate stalking count, which listed both Amy and A.M.W. as intended victims, is duplicitous. Second, he asserts that cyberstalking should have been charged as a single "course-of-conduct" offense and that separating it into various counts offended the rule against multiplicity. These challenges come too late in the day.

Under the Criminal Rules, a defendant must challenge a perceived defect in an indictment before the commencement of trial. Fed. R. Crim. P. 12(b)(3)(B). A failure to mount such a challenge within the prescribed time frame constitutes a waiver. Fed. R. Crim. P. 12(e). This is not a judicial gloss; Rule 12(e) itself uses that precise terminology.

To be sure, this is not a typical "waiver." Waiver normally involves the intentional relinquishment of a known right.

See, e.g., United States v. Carrasco-de-Jesús, 589 F.3d 22, 26 (1st Cir. 2009). "Forfeiture" is the term that is normally used to describe an unexplained failure to make a timely assertion of a right. See, e.g., United States v. Olano, 507 U.S. 725, 733 (1993). This distinction can be important. Waived objections cannot be reviewed on appeal (save for the rare case in which a reviewing court, as a matter solely of its discretion, forgives the waiver), whereas forfeited objections are reviewable for plain error. See id. at 733-34; United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002).

It is an open question in this circuit whether the words "waiver" and "waives," as used in Rule 12(e), should be taken literally. See United States v. Lugo Guerrero, 524 F.3d 5, 11 (1st Cir. 2008).[7] Several other courts of appeals have pondered this question. The majority view is that a party's failure to raise Rule 12(b)(3) defenses prior to trial — such as a challenge to the form of an indictment — constitutes a waiver in the classic sense and, thus, precludes appellate review of the defaulted challenge. See, e.g., United States v. Burke, 633 F.3d 984, 990-91 (10th Cir. 2011); United States v. Dupree, 617 F.3d 724, 727-28 & n.1 (3d Cir. 2010); United States v. Acox, 595 F.3d 729, 730-31 (7th Cir. 2010);

_____

[7] That said, this court has twice in the recent past, albeit without extended discussion, refused to consider arguments that were within Rule 12(e)'s "waiver" proscription. See United States v. Rivera Calderón, 578 F.3d 78, 99 & n.11 (1st Cir. 2009); United States v. Rodríguez-Lozada, 558 F.3d 29, 37-38 (1st Cir. 2009).

United States v. Brooks, 508 F.3d 1205, 1208 (9th Cir. 2007); United States v. Brown, 498 F.3d 523, 527-28 (6th Cir. 2007). A few circuits, however, have treated such defaults as forfeitures and engaged in plain error review. See United States v. Robinson, 627 F.3d 941, 957 (4th Cir. 2010); United States v. Mahdi, 598 F.3d 883, 887-88 (D.C. Cir. 2010); see also United States v. Baker, 538 F.3d 324, 328-29 (5th Cir. 2008) (deeming default a "waiver" but nevertheless applying plain error review).

We believe that Rule 12(e) says what it means and means what it says. Great weight must be given to the plain language of the rule, particularly since Congress amended it in 2002 (after the Supreme Court had made the distinction between waiver and forfeiture pellucid) and left the "waiver" terminology intact. See Fed. R. Crim. P. 12 advisory committee's notes; see also Olano, 507 U.S. at 733 (explaining waiver/forfeiture distinction). What is more, the matters that fall within the compass of Rule 12(b)(3) (and thus Rule 12(e)) are normally correctable before trial if seasonably brought to the attention of the district court and the government. It strikes us as manifestly unfair for a defendant to sit silently by, take his chances with the jury, and then be allowed to ambush the prosecution through a post-trial attack. Accordingly, we join the majority view and hold that a failure to challenge a defect in an indictment before trial, as required by Rule 12(b)(3), results in an unreviewable waiver of that challenge

-20-

pursuant to Rule 12(e). Because the appellant did not raise either duplicity or multiplicity challenges at any time prior to trial, he has waived those challenges.

This framework does not risk a miscarriage of justice due to the presence of a key exception: if a defendant can show "good cause" for a failure to raise a Rule 12(b)(3) challenge prior to trial, that challenge may be entertained by the district court and reviewed on appeal. See Fed. R. Crim. P. 12(e); see also Acox, 595 F.3d at 731. Here, however, the appellant did not make a good cause argument in the district court at any time, and he has not made a cognizable showing of good cause in this court. Given these circumstances, there is no unfairness in holding him to his waiver.

### E. Evidentiary Rulings.

The appellant contends that the district court erred in admitting certain evidence. Where objections have been preserved, we review a district court's evidentiary rulings for abuse of discretion. See United States v. Rodríguez-Vélez, 597 F.3d 32, 40 (1st Cir. 2010).

1. **Prior Bad Acts**. The appellant assigns error to the admission of testimony about incidents that occurred before the events at issue here. On those earlier occasions, he had either threatened family members or behaved violently.

It is common ground that evidence of prior bad acts may not be introduced to prove subsequent "action in conformity

therewith." Fed. R. Evid. 404(b). Nevertheless, evidence of prior bad acts may be admissible if it has special relevance — that is, if it tends to prove a material fact apart from a mere propensity to behave in a certain way — as long as its probative value is not substantially outweighed by any unfairly prejudicial effect. See United States v. Rodríguez-Berríos, 573 F.3d 55, 64 (1st Cir. 2009).

Here, evidence that the appellant's estranged wife and son had witnessed him uttering threats and engaging in violence was specially relevant to show the reasonableness of their apprehension of harm when the appellant, after making a series of menacing statements, departed abruptly for Puerto Rico. The reasonable apprehension of harm is an element of the interstate stalking offense. See 18 U.S.C. § 2261A(1). Where, as here, evidence is probative of an element of a charged crime, Rule 404(b) does not automatically preclude its admission. See United States v. Alzanki, 54 F.3d 994, 1007 (1st Cir. 1995).

The district court found that this evidence was admissible. Pertinently, it found the evidence to be more probative than prejudicial. The balance of probative value and unfairly prejudicial effect is, within wide limits, one for the trial court to strike. See United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002) ("Only rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record,

reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988))). Seen in this light, the court below did not abuse its discretion in permitting the introduction of the so-called "prior bad acts" evidence.

**2. Lay opinions**. The appellant accuses the district court of improperly allowing lay witnesses to offer opinion testimony. The general rule is that a lay opinion, not based upon any scientific or specialized knowledge, is properly admitted when it is rationally premised on the witness's perception and promotes a better understanding of either the witness's testimony or some material fact. See Fed. R. Evid. 701.

Against this backdrop, we turn to the appellant's specific claims. First, he suggests that Tony Walker should not have been permitted to describe his reaction to the letter that he received. This suggestion is baseless: a recipient's reaction to a communication addressed to him is helpful to the jury's determination of whether a threat has been lodged. Fulmer, 108 F.3d at 1499-1500.

The appellant's next complaint, voiced for the first time on appeal, posits that neither the private investigator nor the online counselor consulted by the appellant should have been allowed to opine about his state of mind during their internet

exchanges.  Had there been contemporaneous objections below, this argument might present a close question.  After all, the jurors were presented with the contents of the online conversations and were in as good a position as the witnesses to gauge what those communications portended for the appellant's state of mind.  See United States v. Sanabria, 645 F.3d 505, 515 (1st Cir. 2011) (holding that lay opinion testimony is not admissible "when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion").

But there is a rub.  The appellant never interposed contemporaneous objections to this belatedly challenged testimony.  This boosts the standard of review to plain error.  See United States v. Sánchez-Berríos, 424 F.3d 65, 74 (1st Cir. 2005).

To establish plain error, the appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  The appellant cannot surmount this daunting obstacle: even if the admission of the testimony was error — a question that we do not reach — the error was not plain.

To show plain error, the appellant would have to satisfy all four elements of the relevant test.  See id.  It is readily apparent that the third element is lacking here.  In the grand

scheme of things, the challenged testimony constituted a tiny part of the government's case. Moreover, it is wildly implausible that the jury would have reached a different conclusion about the appellant's intent in the absence of this testimony. Any error in admitting the testimony could not, therefore, satisfy the third prong of the plain error standard. See, e.g., United States v. Richardson, 515 F.3d 74, 83 (1st Cir. 2008).

The appellant also protests the admission of what he characterizes as Amy's opinion testimony regarding her interpretation of various actions taken by him. This protest falls flat. Placing a victim in reasonable apprehension of harm is an element of interstate stalking. The victim is in a unique position to evaluate the effect of a threat. See Fulmer, 108 F.3d at 1501 ("[A] victim's reactions and actions taken in response to an alleged threat are relevant to the determination of whether a statement is a 'true threat.'"). While the victim's subjective view is not controlling, it is assuredly relevant. Thus, the district court did not abuse its discretion in permitting Amy to explain why certain of the appellant's words and deeds frightened her.

There is one loose end. The appellant argues that an FBI agent should not have been permitted to opine that a bag found in the appellant's house, which contained among other things a knife, rubber gloves, and duct tape, was a "murder kit." This was not a

lay opinion at all: the agent had 10 years of law-enforcement experience and was trained in forensics.  See United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987) (holding that DEA agent's experience in combating drug trafficking qualified him to opine on the meaning of a "coded" telephone conversation between suspected dealers).

We need not belabor the point.  The only objection made to this testimony below was on relevancy grounds, and the testimony was unarguably relevant.  See Fed. R. Evid. 401.  The appellant's present argument is thus forfeited, and there was no plain error. Relatedly, we reject the appellant's contention that no foundation was laid for the admission of the "murder kit" evidence.  Amy testified that she found the bag in the Michigan house that the appellant had been inhabiting and that it was in the same room as the appellant's other possessions.  Although other people had lived in the house, Amy's testimony was sufficient to support a finding that the bag belonged to the appellant.  See Fed. R. Evid. 901(a).

**3.  Hearsay**.  Moving to a different series of rulings, the appellant argues that the lower court improperly admitted hearsay evidence.  Hearsay is commonly defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  It follows from this definition that a witness's first-hand account of an out-of-court statement,

not offered to prove the truth of that statement, is not inadmissible hearsay. See Kassel v. Gannett Co., 875 F.2d 935, 945 (1st Cir. 1989). This axiom defeats much of the appellant's hearsay argument.[8] Only a handful of specific hearsay objections survives.

The appellant assails Amy's testimony that he "had threatened to kill [A.M.W.] and then himself." However, this testimony was not hearsay: Amy gave it in response to a question that asked for her personal knowledge. Hearsay requires an out-of-court "statement." Fed. R. Evid. 801(c). The only "statement" referenced in Amy's challenged testimony was the appellant's own alleged threat, which cannot be inadmissible hearsay. See Fed. R. Evid. 801(d)(2).

The appellant's complaint about the admission of various orders entered by Puerto Rico courts turns on a procedural default. The appellant lodged no objection below to the admission of these documents, and we see no plain error.

Nor did the district court commit plain error when it admitted, without objection, an e-mail from Amy's sister recounting

---

[8] There is no need to list every piece of alleged hearsay evidence not offered for its truth. One example should suffice. An FBI agent testified that he was told that the appellant was suspected of flying to Puerto Rico to harm Amy. This testimony was offered to provide context to the agent's involvement in the appellant's arrest, not as proof of the appellant's motive. See United States v. Cruz-Díaz, 550 F.3d 169, 176 (1st Cir. 2008). It was, therefore, not within the hearsay prohibition.

-27-

the substance of her telephone conversation with the appellant. The sister testified at the trial that the appellant, in the course of this conversation, had threatened to kill Amy and A.M.W. Because the e-mail was cumulative of this properly admitted testimony, its introduction did not amount to plain error. See United States v. Bailey, 270 F.3d 83, 88 (1st Cir. 2001).

The appellant's last hearsay contention relates to the admission of A.M.W.'s testimony, over objection, to the effect that police officers and a social worker in Michigan told him that they were removing him from the appellant's care because the appellant had threatened to "blow [A.M.W.'s] head off." A.M.W. had no first-hand knowledge of the threat, so the testimony appears to be a classic example of inadmissible hearsay.

The government insists that this testimony was not offered for the truth of the matter asserted but, rather, to explain how Amy regained custody of A.M.W. This characterization seems inadequate because the government's proffer was not limited in that way. Moreover, the alleged statement went to the heart of the interstate stalking charge, and the "context" exception cannot be stretched to that extent. See United States v. Martin, 897 F.2d 1368, 1371 (6th Cir. 1990).

Here, however, the appellant wins the battle but loses the war. Although the trial court erred in admitting this piece of evidence, its error is not of constitutional magnitude. Thus,

reversal is not required as long as it can be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946); see Fed. R. Crim. P. 52(a). Harmless error review takes into account, among other things, "the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue." United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).

In this instance, the threat related second-hand by A.M.W. was only one of several threats allegedly made by the appellant and described to the jury. Perhaps more important, the jury learned of the very threat mentioned by A.M.W. during Amy's testimony. Accordingly, we conclude without serious question that the error in admitting the disputed portion of A.M.W.'s testimony did not affect the appellant's substantial rights. It was, therefore, harmless.

## F. Sentencing.

The district court grouped the six counts of conviction and sentenced the appellant to serve a 137-month term of

-29-

immurement.  The appellant challenges his sentence on a plethora of grounds.

When confronted with claims of sentencing error, we engage in a two-step pavane.  First, we inquire whether the district court committed any procedural bevues, including any errors in constructing the guideline sentencing range (GSR).  See United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008).  In performing this task, we review the court's interpretation and application of the sentencing guidelines de novo and assay any subsidiary findings of fact for clear error.  United States v. Parrilla Román, 485 F.3d 185, 190 (1st Cir. 2007).  At the second stage of the analysis, we consider the reasonableness of the sentence.  Martin, 520 F.3d at 92.  Review is for abuse of discretion.  United States v. Anonymous Defendant, 629 F.3d 68, 73 (1st Cir. 2010); see Gall v. United States, 552 U.S. 38, 41 (2007).

1.  **Enhancements**.  The appellant begins with a multi-faceted challenge to the procedural reasonableness of the sentence.  The various facets of this challenge consist primarily of attacks on upward adjustments made by the sentencing court in the course of constructing the GSR.

We approach these claims of error mindful both that the government has the burden of proving sentencing enhancements by a preponderance of the evidence, see United States v. Aymelek, 926 F.2d 64, 67 (1st Cir. 1991), and that we must honor the sentencing

court's findings of fact unless those findings are clearly erroneous, see United States v. Villar, 586 F.3d 76, 88 (1st Cir. 2009). We are mindful, too, that the usual rules of evidence do not pertain at sentencing. Rather, the district court may base sentencing determinations on any evidence that it reasonably finds to be reliable. See United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010).

Initially, the appellant argues that the sentencing court erred in finding that the crimes of conviction involved the threatened use of a dangerous weapon (a finding that triggered a two-level upward adjustment, see USSG §2A6.2(b)(1)(C)). This argument trenches on the frivolous: the record contains ample evidence to support a determination that the appellant placed both Amy and A.M.W. in fear of harm through, in part, threats to use a gun. A prototypical example is the appellant's vow, previously described, to "blow [A.M.W.'s] head off."

The appellant's next claim relates to the sentencing court's finding that one of his crimes involved a vulnerable victim — a finding that triggered a two-level upward adjustment, see id. §3A1.1(b)(1). For this enhancement to apply, the victim must have an "impaired capacity . . . to detect or prevent [the] crime," and the defendant must be aware, actually or constructively, of that impairment. United States v. Stella, 591 F.3d 23, 29 (1st Cir. 2009).

In this regard, the sentencing court found that A.M.W. was a victim of the interstate stalking offense, and this finding is not clearly erroneous. The court's corollary finding that the appellant should have known that his pre-teen son was virtually powerless to fend off or prevent the stalking is equally beyond reproof. Minors are often regarded as especially vulnerable victims, see, e.g., United States v. Molina, 226 F. App'x 523, 531 (6th Cir. 2007), and the nature and circumstances of this interstate stalking offense made such a finding appropriate. See generally USSG §3A1.1, comment. (n.2) (explaining that victim can be vulnerable due to, among other things, age or mental condition). The impaired capacity of a young boy caught in the toils of his parents' deteriorating marriage is readily evident.

The sentencing court's use of a two-level enhancement under USSG §3B1.4 was likewise supportable. There is evidence in the record that the appellant used a minor (A.M.W.) in the commission of the cyberstalking crimes. A.M.W. testified that the appellant had forced him to write an e-mail to Amy in an effort to convince her that a particular e-mail account belonged to him (A.M.W.). The appellant then used that same account to send threatening e-mails to Amy while masquerading as A.M.W. On this basis, the enhancement for using a minor in connection with the commission of a crime was fully warranted.

**2.** **Departures**. Having made these and other (unchallenged) determinations, the sentencing court tentatively assigned the appellant an adjusted offense level of 26. The combination of this offense level and a criminal history category (CHC) of I normally would produce a GSR of 63 to 78 months. Here, however, the court essayed two upward departures and measured their extent by making corresponding changes to the sentencing grid.

Specifically, the court departed upward by two levels for the unusual seriousness of the interstate stalking crime. See id. §2A6.2, comment. (n.5). It simultaneously increased the CHC from I to IV to represent more accurately the appellant's criminal past. See id. §4A1.3(a)(1). These departures elevated the GSR to 110 to 137 months, and the court sentenced the appellant at the top of this reconstructed range. The appellant contests both departures.

We review the factual findings on which a departure rests for clear error. United States v. Pacheco, 489 F.3d 40, 44 (1st Cir. 2007). The ultimate departure decision engenders abuse-of-discretion review. United States v. Roselli, 366 F.3d 58, 67 (1st Cir. 2004). In determining that the interstate stalking offense was so serious as to take it out of the heartland, the sentencing court gave weight to the number and horrific nature of the appellant's threats, the length of time over which the threats were made, and the meticulousness of the appellant's plotting. Even though an upward adjustment already had been made for the

-33-

appellant's "pattern" of behavior, see USSG §2A6.2(b)(1)(D), the atypical extent of this pattern and the aggravating factors allowed the sentencing court to make an upward departure.  See id. §2A6.2, comment. (n.5) (explaining that "an upward departure may be warranted if the defendant stalked the victim on many occasions over a prolonged period of time"); see also United States v. Ruggles, No. 98-5477, 2000 WL 331970, at *8-9 (6th Cir. Mar. 24, 2000) (affirming upward departure in analogous circumstances).

By like token, the sentencing court's determination that the appellant's CHC underrepresented his criminal past was within the encincture of its discretion.  See USSG §4A1.3(a)(1).  In formulating this departure, the court appropriately considered (i) the appellant's criminal contempt conviction, which resulted in a sentence of more than sixty days imprisonment and which was unrelated to the pattern of stalking for which he was being sentenced, see id. §4A1.1(b); (ii) the mailing of the threatening letter while imprisoned, see id. §4A1.1(d); and (iii) the fact that the appellant engaged in stalking while on pretrial release for a separate violent crime in Michigan, see id. §4A1.3, comment. (n.2(A)(iv)).[9]

---

[9] The appellant makes a bald assertion that a sentencing court may add no more than two criminal history points for the commission of a crime while on pretrial release.  Appellant's Br. at 60. Nothing in either the sentencing guidelines or the case law supports this proposition.

**3.  Substantive Reasonableness**.  The appellant's final sentencing challenge implicates the substantive reasonableness of his sentence.  This challenge fails.  The appellant committed a litany of serious crimes, and the aggravating factors are many and varied.  The sentencing court considered the totality of the circumstances, weighed all of the relevant factors, see 18 U.S.C. § 3553(a), and imposed a sentence within (albeit at the apex of) the reconstructed GSR.

There is no single reasonable sentence in any particular case but, rather, a universe of reasonable outcomes.  As long as the sentence imposed is procedurally sound and falls somewhere within this range of reasonableness, we will uphold it.  See United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006).

In the case at hand, the able district judge gave a plausible rationale for the sentence that he chose and reached a defensible result.  The sentence is stiff but, given all the facts, we cannot say that it falls outside the "range of reasonable sentencing options."  Anonymous Defendant, 629 F.3d at 78.  Consequently, we reject the appellant's challenge.

### G.  Ineffective Assistance.

There is one final issue that we must discuss.  In a last-ditch argument, the appellant posits that his trial counsel provided ineffective assistance.  The appellant did not advance

this argument in the court below, and we will not entertain it here.

We have encountered this type of situation before, and it suffices simply to repeat what we already have written. "Since claims of ineffective assistance involve a binary analysis — the defendant must show, first, that counsel's performance was constitutionally deficient and, second, that the deficient performance prejudiced the defense — such claims typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal." United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (citation omitted). Because the Mala court's description fits the circumstances of this case, we deny the appellant's ineffective assistance of counsel claim without prejudice to his right to renew it, if he so chooses, by means of a petition under 28 U.S.C. § 2255.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court must stand.

**Affirmed**.