# United States Court of Appeals
## For the First Circuit

No. 14-1042

UNITED STATES OF AMERICA,

Appellee,

v.

BENJAMIN LEE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,
Kayatta and Barron, Circuit Judges.

Peter J. Cyr on brief for appellant.
Margaret D. McGaughey, Assistant United States Attorney, and
Richard W. Murphy, Attorney for the United States, acting under
authority conferred by 28 U.S.C. § 515, on brief for appellee.

June 12, 2015

**LYNCH, <u>Chief Judge</u>**.  Following a jury trial, Benjamin Lee was convicted of two counts of interstate stalking with the intent to harm, or even kill, his estranged wife and her boyfriend, in violation of 18 U.S.C. §§ 2261A(1) and 2261(b)(5), and sentenced to 100 months' imprisonment.  On appeal, he challenges the admission of evidence of his earlier domestic abuse of his wife, the conduct of his trial, and the sufficiency of the evidence against him.  He also says his sentence was unreasonable.  There was no error.  Lee had a fair trial, the jury verdict was soundly based, and the sentence was reasonable in view of the facts.

I.

We review the facts in the light most favorable to the jury's guilty verdict.  <u>See</u> <u>United States</u> v. <u>Rodríquez</u>, 731 F.3d 20, 23 (1st Cir. 2013).

The interstate stalking convictions follow upon Benjamin Lee's turbulent relationship with his then-wife, Tawny Lee, who had left him in Missouri, and her boyfriend, Timothy Mann, with whom she lived in Maine.  Because two Lees are involved, we use their first names.

Tawny met Benjamin in Colorado around 1970, when she was eight.  She began dating Mann when she was 16.  After Mann left to work on a family farm, he and Tawny separated, and Tawny began dating Benjamin.  Tawny continued a friendship with Mann, angering

-2-

Benjamin, which eventually caused Tawny to distance herself from Mann. Tawny's mother and a friend testified that Benjamin was controlling and verbally abusive toward Tawny.

One incident occurred around 1979. Benjamin drove up to a car containing Tawny, her brother, her sister-in-law, and Mann, whom Tawny had previously dated. Benjamin approached the car, opened the driver's side door, pushed the driver's seat forward, pulled Tawny out of the car by her clothing, pushed her into his car, and drove away. Tawny testified that, while driving away, Benjamin told her "if he couldn't have [Tawny], no one could." Tawny stayed with Benjamin because she "feared what he could possibly do or would do." They married in the late 1970s, eventually having two children. Six months after the 1979 car incident, Tawny and Benjamin argued. Tawny ran out of their home to the end of the street, where Benjamin grabbed her by the hand and pulled her back into the apartment where they lived.

Tawny testified that Benjamin subjected her to near daily verbal abuse for the duration of their marriage. According to the Presentence Investigation Report, they divorced in 1993.

Tawny returned to Benjamin when he told her he had "people" watching Mann's house, where Tawny spent time. Tawny and Benjamin moved together from Colorado to Missouri. In 2001, the couple remarried, so Benjamin could have back surgery while covered

by Tawny's insurance. Benjamin continued to abuse Tawny, verbally and sometimes physically.

On July 5, 2010, Tawny picked up medication for Benjamin, then picked her son up from college before returning home. On returning home, Benjamin berated Tawny for failing to drop the medicine off with Benjamin first, and when Tawny tried to flee, Benjamin hit her with his cane. Tawny's daughter called the police, but Tawny did not press charges.

In the fall of 2011, Tawny reconnected with Mann through Facebook. Around the same time, she testified that she also became upset at Benjamin's "associat[ion] with people that [Tawny] felt had extreme poor moral conduct." The couple argued, and Tawny repeatedly threatened to leave Benjamin. In December 2011, Tawny made plans to leave.

In February 2012, Benjamin broke his back in an automobile accident. He was hospitalized for two weeks, and Tawny cared for him at home for six weeks.

In April 2012, Tawny left Benjamin and moved with Mann to Maine. In the ensuing months, Benjamin searched for Tawny, emailing her 300 times and calling relatives. Some of the emails contained threats toward Mann and threats to "[n]ail [Tawny's] head on the wall." Tawny's mother filed a police report after Benjamin left her angry messages accusing her of hiding Tawny.

The Lees communicated by phone and email, with Benjamin blaming his behavior on his medications. Tawny insisted that Benjamin leave her alone, but Benjamin threatened that he would find her when able and that the police would not be able to prevent him from acting. Tawny understood one email from Benjamin to be a death threat.

Benjamin was hospitalized in Missouri three times between April and July 2012. His diagnoses included altered mental status, hypoglycemia, drug abuse, diabetes, a thyroid disorder, high blood pressure, and depression. Benjamin, who is morbidly obese, was scheduled to have another back surgery, and the Lees began communicating more frequently by phone. Tawny took his emails after the hospitalization to be "more cordial" and not "rude." Around the same time, at the urging of Benjamin's sister, Tawny gave Benjamin her address in Maine. She and Mann had moved to Limerick, Maine, and Tawny was concerned that Benjamin would discover her previous address and entangle the person living there, Mann's uncle. She also thought that Benjamin would eventually discover her location.

Upon learning Tawny's location, Benjamin told a friend that he would "kill [Mann] and if Tawny didn't come home, he would kill her too." His sister testified that, in July and August 2012, Benjamin made near-daily promises to harm Tawny or Mann. On July

27, 2012, Benjamin changed his will to leave everything to his son, to the exclusion of his wife and daughter.

In August 2012, Benjamin borrowed his brother's white Cadillac and told his son and a sister that he was leaving for a fishing trip in Colorado with a friend. Disbelieving him, Benjamin's sisters contacted Tawny and warned her that they thought Benjamin was headed to Maine. Tawny and Mann applied for a restraining order in Maine state court near Sanford, Maine, on September 7, but it was refused.

Benjamin was in fact heading to Maine. On September 7, from a McDonald's in Rumford, Maine, an hour from Limerick, Benjamin emailed Tawny and said, misleadingly, that he was en route to his mother's home in Kansas. Later that day, Mann spotted a white Cadillac with Missouri license plates driving past the house in which Tawny and Mann lived. The car drove past the house approximately a dozen times, then stopped, and the driver got out of the car, opened the car's trunk, then closed it and returned to the driver's seat. Tawny called the police, while Mann got his shotgun. Mann testified that "everybody was in a state of panic" and "scared to death." The car moved on.

A Maine state trooper stopped the white Cadillac about four miles from the home and arrested Benjamin. A search of the car revealed five firearms, including two loaded handguns and a loaded shotgun. The car also contained two knives, a bayonet, two

rolls of duct tape, rope, rubber gloves, plastic bags and sheeting, handcuffs, camouflage face paint, ammunition, maps identifying Tawny's home, and a walker. Benjamin's brother testified that the family kept many of those items in the car for hunting and camping, but also that other of the items found in the car did not belong to him. Analysis of Benjamin's computer showed that he had searched for a blueprint of Tawny's home, and he told the police that he had been able to find its layout. A camera contained photos of the house. After the arrest, Lee's son discovered a note from his father explaining that, when the son read it, Lee would "probably" be "either dead or not with you any longer." Lee did not testify; he did present four defense witnesses.

## II.

On December 4, 2012, Benjamin was charged in the United States District Court for the District of Maine with two counts of interstate stalking, with Tawny and Mann each identified as a victim. The federal interstate stalking statute punishes those who

> travel[] in interstate or foreign commerce . . . with the
> intent to kill, injure, harass, intimidate, or place
> under surveillance with intent to kill, injure, harass,
> or intimidate another person, and in the course of, or as
> a result of, such travel or presence engage[] in conduct
> that —
>     (A) places that person in reasonable fear of the
> death of, or serious bodily injury to —
>
>         (i) that person;

-7-

> (ii) an immediate family member . . . of that person; or
>
> (iii) a spouse or intimate partner of that person; or
>
> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A) . . . .

18 U.S.C. § 2261A(1). On September 16, 2013, a jury convicted Benjamin on both counts.

The Presentence Investigation Report recommended a guidelines sentencing range of 51 to 63 months. The district court varied above the guidelines, imposing a total sentence of 100 months: 60 months on Count One and 40 months on Count Two, to be served consecutively, followed by three years of supervised release. The district court entered the judgment on January 6, 2014, and this appeal followed the same day.

### III.

Benjamin challenges both his conviction and sentence.

A. <u>Conviction</u>

Benjamin attacks his trial in three respects. First, he argues that the district court erred in admitting evidence of his history of abusing Tawny. Second, he argues that the district court improperly truncated his trial proceedings, preventing him from obtaining a fair trial. Third, he argues that the evidence was insufficient to convict him. He is wrong on all three.

1. Evidentiary Rulings

Before trial, Benjamin moved in limine to exclude evidence of the 1979 car incident, the 2010 incident involving the cane, and any evidence of a pattern of his abuse of Tawny during their marriage, under Rules 404(b) and 403 of the Federal Rules of Evidence.[1] Rule 404(b) prevents the introduction of prior bad acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," though it permits the introduction of the same evidence to show motive or intent, or for other purposes. Fed. R. Evid. 404(b). As relevant here, Rule 403 allows a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Id. 403.

The district court denied the motion as to testimony regarding the prior abuse of Tawny. In its view, evidence of Benjamin's past abuse of Tawny was relevant to whether her fear of Benjamin at the time of his arrest was reasonable, and that reasonable fear went to an element of the offense. See 18 U.S.C. § 2261A(1)(A) (defining the crime as conduct that "places that person in reasonable fear" of serious harm (emphasis added)). The

---

[1] Benjamin also moved pretrial to exclude evidence that he was abusive toward his daughter and sister, as well as evidence that he engaged in acts of animal cruelty. The government did not object to that motion, except for use as impeachment or for rebuttal, and Benjamin does not argue on appeal that any such evidence was in fact used at trial.

evidence was also relevant to Benjamin's motive or intent, a permissible purpose under Rule 404(b). See Fed. R. Evid. 404(b)(2). To minimize prejudice, the district court gave a limiting instruction, explaining that the evidence of past physical or verbal abuse could not be used to infer guilt for the charged crime through Benjamin's character, but "only for the limited purpose of deciding whether [Benjamin], at the time of his interstate travel, had the state of mind or intent necessary to commit the crimes charged." This instruction limited use of the testimony at trial to a basis more narrow than it concluded when denying the motion in limine.

We review the district court's decision for abuse of discretion. United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004). There was none. Benjamin's principal argument on appeal is that the evidence of a defendant's past abuse of a victim is irrelevant. He relies on the interstate stalking statute's language that a violator must place a person in reasonable fear by conduct "in the course of, or as a result of, [interstate] travel or presence." 18 U.S.C. § 2261A(1). Under his reading, only conduct that occurs during interstate travel or after arrival is relevant to the offense, and that makes any earlier fear-inducing conduct irrelevant.

This court rejected this argument in United States v. Walker, 665 F.3d 212 (1st Cir. 2011). There, we affirmed the

denial of a motion for judgment of acquittal which had been based on the same grounds as Benjamin now argues. See id. at 224-26. We held that conduct causing reasonable fear "as a result of" interstate travel must be "viewed in the historical perspective of previous events." Id. at 225. Having so read the statute, we also rejected the defendant's challenge to the introduction of his threats and violent behavior prior to his interstate travel, explaining that it was relevant to "the reasonableness of . . . apprehension of harm." Id. at 229. The analysis in Walker applies here. Benjamin's prior bad acts are relevant to the reasonableness of the fears of Tawny and Mann, which are informed by the context in which Benjamin engaged in interstate travel.

Benjamin argues that even if the evidence were relevant, its relevance is substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403. We overturn a district court's "on-the-spot" Rule 403 balancing "[o]nly rarely -- and in extraordinarily compelling circumstances." United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013) (quoting United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011)) (internal quotation marks omitted). There is no extraordinarily compelling reason to do so here, especially in light of the district court's limiting instruction.

### 2. Trial Timing

Benjamin's trial was scheduled to conclude on Monday,

September 16, 2013. Well before trial, a pretrial schedule was set, without objection, which so provided. The presiding judge had planned to travel outside Maine the following day. During the trial, the judge ensured that the trial proceeded efficiently, telling the parties to "keep using every available minute" and warning the jury that they might need to stay late on Monday. The defendant's counsel expressed some concern about the schedule on Thursday, September 12. But on Friday, September 13, the parties rested, and the defense told the judge, "We are in very good shape. No further witnesses." The jury deliberated on the 16th and returned a verdict the same day.

On appeal, Benjamin argues that the district court "unreasonably and arbitrarily insisted that the case be finished by Monday, September 16, 2013," depriving him of "a meaningful opportunity to present a complete defense." Our review is for abuse of discretion, reversing "only where the Court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." United States v. Romero-Lopez, 695 F.3d 17, 21 (1st Cir. 2012) (quoting United States v. Mangual-Santiago, 562 F.3d 411, 429-30 (1st Cir. 2009)) (internal quotation marks omitted). At the close of his case, defense counsel expressed satisfaction with the proceedings. On appeal, Benjamin does not identify any evidence he was prevented from offering or any prejudice to him. See United States v. Delgado-

<u>Marrero</u>, 744 F.3d 167, 196 (1st Cir. 2014) (emphasizing the importance of prejudice when reviewing the denial of a continuance).  The district court did not abuse its discretion.[2]

### 3. <u>Sufficiency of the Evidence</u>

Benjamin attacks the sufficiency of the evidence in a variety of respects.  Tawny's and Mann's fears were unreasonable, he argues, in light of his health problems, his lack of "alarming conduct" while driving by the house, and his arrest several miles from their home.  The items found in his car are used in camping, and some belonged to his brother.  He never directly threatened Mann, and his threats to Tawny were "hyperbolic reactions to the demise of his marriage."  He says Tawny had to have known that his threats were caused by mental problems associated with his health, and once he recovered from hypoglycemia, their communications were nonthreatening and focused on property issues relating to their divorce.  And, the pro se brief adds, he traveled to Maine only to take photos for use in the divorce, so he lacked the criminal

---

[2] In a pro se brief, Benjamin argues he received ineffective assistance of counsel.  He alleges that, due to the trial schedule, his trial counsel omitted the testimony of two witnesses and convinced him not to testify, along with other allegations of prejudice.  "[W]e do not generally address ineffective assistance claims on direct appeal, but instead require them to be raised on collateral review."  <u>Delgado-Marrero</u>, 744 F.3d at 197 n.31.  We will reach such claims when "scrutiny of the factual record is unnecessary because the attorney's ineffectiveness is manifestly apparent from the record," <u>id.</u> (quoting <u>United States</u> v. <u>Neto</u>, 659 F.3d 194, 203 (1st Cir. 2011)) (internal quotation marks omitted), but this is not such a case.

intent required by statute.  That, of course, is not what he said earlier, when he said that "he was going to kill [Mann,] and if Tawny didn't come home, he would kill her too."

We affirm if "a rational jury could find the defendant guilty beyond a reasonable doubt." Walker, 665 F.3d at 224.  It is abundantly clear from the record that a rational jury could find the defendant guilty.

B.  Sentencing

Benjamin similarly attacks his 100-month sentence in three respects.  We review challenges to a sentence in two steps, reviewing claims of procedural error before considering the sentence's substantive reasonableness.  United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).  Our review is for abuse of discretion, evaluating the interpretation and application of the guidelines de novo and factual findings for clear error. Id.; United States v. Maisonet-González, __ F.3d __, 2015 WL 1965863, at *3 (1st Cir. May 4, 2015).

First, Benjamin argues that the district court improperly applied a two-level sentencing enhancement for offenses involving "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim" when calculating his Guidelines range.  U.S.S.G. § 2A6.2(b)(1) (2013).  The commentary to the guidelines indicates that a pattern of activity involves, "under the totality of the circumstances, any conduct that occurred prior

-14-

to or during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense." Id. cmt. n.3. We have analyzed this provision by "identify[ing] a pattern of activity that fits the guideline description," and "determin[ing] whether the offense 'involves' that pattern." United States v. Robinson, 433 F.3d 31, 37 (1st Cir. 2005).

The district court found that Benjamin threatened Tawny in a series of emails through the Spring of 2012. That is enough to sustain the pattern-of-activity enhancement. Benjamin argues that those threats should not count under the guidelines because they were made while he suffered from hypoglycemia, but he has not shown that the district court's contrary factual finding was clear error.[3]

Second, Benjamin argues that the district court erred by denying him a downward departure (or variance) for his mental and physical condition, as permitted by §§ 5H1.3 and 5H1.4 of the guidelines. The district court "recognize[d]" its discretion to depart under those sections, but it declined to do so "for reasons that have to do with danger to the victims and to the public." In particular, the district court concluded that Benjamin had "no

---

[3] Like the district court, we need not consider whether the incidents of physical abuse from 1979 to 2010 are too old to count as substantially and directly connected to the underlying offense for the purposes of sentencing, because the more recent emails suffice.

recognition . . . as to the conduct he engaged in, the seriousness of it."

On appeal, Benjamin emphasizes the seriousness of his health and mental problems. Aware of those concerns, the district court recommended a special assignment to the Bureau of Prisons. But it did not reduce Benjamin's sentence, and that choice was not an abuse of discretion.

Finally, Benjamin challenges the substantive reasonableness of his sentence. The district court varied thirty-seven months above the guidelines range, imposing a 100-month sentence. The court provided a detailed statement of its reasons for doing so. After reviewing the relevant factors under 18 U.S.C. § 3553(a), the district court explained that this case "is [not] a standard variety misdemeanor domestic violence" case. Citing to Benjamin's letter to his son, the items in the car, and Benjamin's knowledge of the layout of the Limerick house, the district court concluded that "[t]his was a serious interstate stalking case" that "created exceeding danger." While recognizing Benjamin's medical issues, the district court also noted that Benjamin still did not recognize the seriousness of his conduct. The court heard allocution from Benjamin. Indeed, the district court stated its concern that nothing it could do would deter Benjamin: "I see no recognition on the part of the defendant as to the conduct he engaged in, the seriousness of it and so I have real concern for

protecting the victims and the public."  The "need for just punishment, the seriousness of the crime, the respect for the law and . . . the need to protect the public and the horrific nature of the crime that was interrupted" justified the upward variance.  The court rejected the statutory maximum as more than was needed. There was no abuse of discretion.  We need not add more.

IV.

The conviction and sentence are <u>affirmed</u>.

<u>So ordered.</u>