# United States Court of Appeals
## For the First Circuit

No. 10-2462

UNITED STATES,

Appellee,

v.

REYNALDO LANDRÓN-CLASS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Rafael F. Castro Lang for appellant.
Scott H. Anderson, Assistant United States Attorney, with whom
Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson Pérez-
Sosa and Thomas F. Klumper, Assistant United States Attorneys, were
on brief, for appellee.

August 29, 2012

**LIPEZ**, **Circuit Judge**.  Appellant, Reynaldo Landrón-Class, was tried and convicted in the United States District Court for the District of Puerto Rico for his role in a scheme to illegally obtain and distribute prescription drugs.  On appeal, Landrón-Class challenges his conviction on numerous grounds, including: 1) a pre-trial ruling during the voir dire, 2) evidentiary rulings made by the district court during his trial, 3) the court's decision not to order certain documents turned over to him as Jencks Act material, and 4) the denial of his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  He also asserts multiple errors in the determination of his sentence.

We conclude that the district court did err in allowing testimony about the guilty pleas of appellant's former co-defendants; however, this error was harmless.  Additionally, in resolving a claim of sentencing error, we join other circuits in holding that, in determining the appropriate sentence within the guidelines, or in varying from the guidelines, a sentencing court has discretion to consider the defendant's cooperation with the government as an 18 U.S.C. § 3553(a) factor, even if the government has not made a United States Sentencing Guidelines ("USSG") § 5K1.1 motion for a downward departure.

Finding no reversible error in the district court's decisions, we affirm.

We begin with an abbreviated version of the facts underlying this appeal, reserving for our analysis of appellant's individual arguments a more detailed description of the facts relevant to each. We present the facts in the light most favorable to the verdict. See United States v. Díaz, 670 F.3d 332, 337 (1st Cir. 2012).

Appellant was originally indicted with twenty-one other defendants for his role in a conspiracy to possess and distribute approximately 435 kilograms of oxycodone and 278 kilograms of alprazolam from January 2005 to September 2007. He moved to dismiss the indictment, arguing that there was no single conspiracy among the various co-defendants. The district court denied this motion as moot after appellant was re-indicted, in September 2009, with just one other co-defendant, Miriam Daisy-Perez. This new indictment charged that the two co-defendants conspired to possess with intent to distribute approximately forty-four kilograms of oxycodone over the period January 2005 to September 2007.[1] Specifically, appellant allegedly obtained, from a single doctor,

---

[1] Oxycodone is an opiate analgesic, available only by prescription. As an opiate, it has an effect on users similar to that of heroin, and it is often used recreationally. Because of these facts, it is classified as a Schedule II controlled substance under the Controlled Substances Act and implementing regulations, 21 C.F.R. § 1308.12(b)(1)(xiii), meaning that it "has a currently accepted medical use," but also "a high potential for abuse," 21 U.S.C. § 812(b)(2)(A) & (B).

at least 2,700 medically unnecessary prescriptions for oxycodone in his name and the names of others, and used these prescriptions to obtain oxycodone from various pharmacies.

Appellant was offered a deal by the government, whereby it would recommend a sentence of seventy months' incarceration if he pled guilty to the charges. He rejected this offer because of the disparity between the deal offered to him and that offered to other defendants involved in the same scheme.[2] Accordingly, appellant was tried before a jury in June 2010. Even though he had admitted the offense conduct during the government's investigation, appellant denied at trial his participation in the conspiracy and argued that he was factually innocent.

The primary government witness was Dr. Jose Victor Vázquez-Senti, from whom appellant obtained the prescriptions used in the scheme. Dr. Vázquez-Senti testified that appellant initially came to him as a patient in late 2004, complaining of back pain. However, after the treatment ended, Vázquez-Senti continued to supply prescriptions to appellant for a fee. Initially, appellant simply dictated the names that Vázquez-Senti used to write prescriptions. But, around December 2006, appellant provided five "patient" lists to Vázquez-Senti, each containing

---

[2] For example, Daisy-Perez was the owner of a pharmacy from which oxycodone was obtained. She negotiated a non-cooperation plea agreement calling for a sentence of probation and was ultimately sentenced to three years' probation.

between six and fifty-six names and addresses. Appellant regularly called Vázquez-Senti to instruct the doctor to write new prescriptions in the names of individuals on the lists, and Vázquez-Senti subsequently delivered the prescriptions to appellant -- about twenty each week. Generally, the prescriptions were filled at one of three pharmacies, and, over the course of the conspiracy, Vázquez-Senti wrote at least 2,700 medically unnecessary prescriptions for appellant's use.

The Drug Enforcement Administration ("DEA") became aware of the unusual pattern of Vázquez-Senti's prescriptions and started an investigation. The DEA secured a wiretap of the doctor's phone and recorded calls in which the doctor and appellant discussed their activities, including the preparation of prescriptions and how best to obtain drugs from various pharmacies. The DEA eventually arrested appellant, Vázquez-Senti, and twenty other individuals, including owners of the pharmacies from which drugs were obtained and individuals who filled the prescriptions at the pharmacies. Excepting appellant, each of the other individuals indicted pled guilty to at least some of the charges against them.

At the conclusion of a four-day jury trial, appellant was found guilty of conspiracy to possess with intent to distribute 676.50 grams of oxycodone. The jury also found that the government was entitled to a forfeiture of $541,200, the estimated proceeds of the conspiracy. Appellant was sentenced to 240 months'

incarceration, which was below the guidelines range, but the maximum sentence permitted by statute. This appeal followed.

## II.

## A. Pre-trial and Trial Rulings

### 1. Voir Dire of Potential Jurors

Appellant challenges two aspects of the district court's handling of the voir dire. He argues that it was error for the court to decline to ask potential jurors questions that he proposed concerning their legal use of prescription drugs, prior grand jury service, and general personality traits. He also argues that the court erred in failing to dismiss juror number 26 for cause because of a purported bias against drug users and the fact that she was the daughter of two attorneys -- a retired judge and a former attorney with the Puerto Rico Department of Justice.

We review challenges to the trial court's voir dire of the jury under an abuse of discretion standard. United States v. Sherman, 551 F.3d 45, 49 (1st Cir. 2008). We have noted that, "[b]ecause the trial court observes the demeanor and reactions of the prospective jurors, we review its determination of jury impartiality with 'special deference.'" Id. at 51 (quoting United States v. Moreno Morales, 815 F.2d 725, 733 (1st Cir. 1987)). Furthermore, a court "need not . . . pose every voir dire question requested by a litigant. It is more than enough if the court covers the substance of the appropriate areas of concern by framing

-6-

its own questions in its own words." Id. (quoting Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987)) (internal quotation marks omitted).

Here, although the district court declined to give prospective jurors the questionnaire proposed by appellant, it noted that many questions included in the questionnaire were similar to the questions that it did ask prospective jurors. For example, it asked about experience with drugs and drug-related crimes, whether the prospective jurors had connections to law enforcement, either themselves or through friends and family members, and whether the prospective jurors felt that they would be able to presume appellant innocent. These questions were sufficient to probe for potential biases. It was not an abuse of discretion for the court to decline to ask the questions proposed by appellant.

The court also did not err in declining to strike juror number 26 for cause. After individual questioning of this juror, the court determined that she did not have a bias against drug users. Although the court also noted that the juror's father was a retired judge, it determined that this fact did not render her unfit for jury service, an unremarkable conclusion. As we have explained, "[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the

empaneling of a jury." <u>United States</u> v. <u>Gonzalez-Soberal</u>, 109 F.3d 64, 69-70 (1st Cir. 1997) (internal quotation marks omitted). There was no abuse of discretion here.

### 2. **Authentication of Prescriptions by Vázquez-Senti**

Appellant's challenges to his conviction include preserved evidentiary objections, reviewable for abuse of discretion. <u>United States</u> v. <u>Mare</u>, 668 F.3d 35, 38 (1st Cir. 2012). Of course, even if such an error occurred, it would not serve to overturn a conviction if it ultimately proved harmless. <u>See</u> <u>United States</u> v. <u>Walker</u>, 665 F.3d 212, 231-32 (1st Cir. 2011). An error is harmless if we can conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." <u>Id.</u> at 231 (quoting <u>Kotteakos</u> v. <u>United States</u>, 328 U.S. 750, 765 (1946)) (internal quotation marks omitted).

The district court admitted into evidence approximately 2,700 prescriptions written by Vázquez-Senti and seized by government agents from computers at the three different pharmacies from which appellant obtained drugs. They were admitted into evidence pursuant to Federal Rule of Evidence 901(b)(1), which allows authentication through testimony of a witness with knowledge of the nature of the item. The government provided a foundation for the prescriptions through testimony by Vázquez-Senti, who reported that he wrote them and gave them to appellant and others.

-8-

Vázquez-Senti testified that the prescriptions were medically unnecessary and that he took the names appearing on them from the lists that appellant provided to him.  On appeal, appellant argues that it was error for the court to admit the prescriptions without authenticating testimony from someone with knowledge of how the prescriptions were presented and filled at each pharmacy.

Rule 901(b)(1) permits authentication of evidence on the basis of "[t]estimony of a witness with knowledge" that the evidence is what it is claimed to be.  Thus, "[a] document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so."  Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774 n.8 (9th Cir. 2002) (second alteration in original) (quoting 31 Charles Alan Wright & Victor J. Gold, Federal Practice & Procedure: Evidence § 7106 (2000)) (internal quotation marks omitted); see also Dugas v. Coplan, 428 F.3d 317, 334 n.25 (1st Cir. 2005) (noting that a letter may be authenticated under Rule 901(b)(1) by testimony from its author).

In this case, Vázquez-Senti testified that he wrote all of the prescriptions offered into evidence by the government. Having so testified, he could authenticate the prescriptions as those written at the request of appellant and testify that they were medically unnecessary.  See Orr, 285 F.3d at 774 n.8. Vázquez-Senti testified that he had reviewed the prescriptions,

recognized them as coming from his prescription pad, and identified his signature.

Appellant's argument that the prescriptions were used to show how they were presented at various pharmacies -- a topic on which Vázquez-Senti lacked knowledge -- has no merit. The government did not have to show how the prescriptions were filled to convict appellant of conspiracy. It was enough to prove appellant's role in the conspiracy to show that he obtained the prescriptions with the intent that they be used for an illegal purpose. See United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005) ("To prove conspiracy in a criminal case, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying substantive offense, and that the defendant elected to join the agreement, intending that the underlying offense be committed."). Moreover, the government offered the prescriptions to show how appellant obtained the drugs sold through the scheme. Vázquez-Senti was the only witness capable of testifying to the origin of the prescriptions and to the fact that they were medically unnecessary. A DEA agent later testified as to how the prescriptions were seized from various pharmacies. Accordingly, the court's decision to admit the prescriptions with Vázquez-Senti's authentication was not an abuse of its discretion.

### 3. Vázquez-Senti's Testimony Regarding Other Defendants

During his cross-examination, appellant asked Vázquez-Senti about benefits he was receiving from the government in exchange for his testimony. Vázquez-Senti acknowledged that he was held responsible for only 745 medically unnecessary prescriptions, and appellant contrasted this number with the 20,000 that Vázquez-Senti had admitted to writing. On redirect, the government attempted to diffuse this impeachment by eliciting testimony about Vázquez-Senti's co-defendants, showing that they had received similar reductions even though they were not testifying. Over appellant's objection, the district court allowed the government to ask Vázquez-Senti if he knew the status of the charges against his co-defendants. After Vázquez-Senti indicated that he did, the government asked, "[a]re you aware as to whether or not they pled guilty to 435 kilos of oxycodone, or they pled guilty to a lesser amount?" Vázquez-Senti replied, "I believe it were [sic] to a lower amounts." The government briefly alluded to these guilty pleas again during its closing argument. In response to appellant's objection, the court ruled that appellant had opened the door on cross-examination to this redirect testimony by asking Vázquez-Senti about the benefits he received because of his cooperation.

Appellant now repeats his argument that admission of this testimony was inappropriate and prejudicial. In defending the

district court's ruling, the government emphasizes that the cross-examination justified questions about the guilty pleas of Vázquez-Senti's co-defendants because it referred to the separate criminal case in which Vázquez-Senti and his co-defendants were convicted. The government argues that it was entitled to show that all of the co-defendants, not just Vázquez-Senti, pled guilty to lesser drug quantities, and thus Vázquez-Senti did not receive any additional benefit because of his testimony against appellant.

We have previously explained that "where a missing co-defendant does not testify, . . . courts and prosecutors generally are forbidden from mentioning that a co-defendant has either pled guilty or been convicted." United States v. Ofray-Campos, 534 F.3d 1, 23 (1st Cir. 2008) (internal quotation marks omitted). This is because "[a] defendant is entitled to have the question of his guilt determined upon the evidence against him, not on whether a codefendant or government witness has been convicted of the same charge." Id. at 22-23 (quoting United States v. Dworken, 855 F.2d 12, 30 (1st Cir. 1988)) (internal quotation marks omitted).

> Regardless of whether an absent co-defendant has pleaded guilty or been convicted after trial, the admission of such evidence not only results in the danger that the jury will improperly infer guilt by association, it also significantly undercuts the defendant's right to have a jury's verdict based only upon evidence that is presented in open court and is thereby subject to scrutiny by the defendant.

Id. at 23 (internal quotation marks omitted). Accordingly, "[t]here is no need to advise the jury or its prospective members that some one not in court, not on trial, and not to be tried, has pleaded guilty. The prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious." Id. (internal quotation marks omitted).

In this case, the individuals whose guilty pleas were revealed by the government's questioning were not co-defendants of appellant, but the co-defendants of Vázquez-Senti. However, the vast majority of the evidence against appellant concerned the relationship between the two men. The guilty pleas of the individuals indicted with Vázquez-Senti on charges similar to those against appellant are plainly inadmissible. The government's attempt to suggest this sort of guilt-by-association is clear in its reminder to the jury during its closing argument. It told the jury: "The doctor told you he was indicted with 21 other people, including pharmacists. So [appellant] talks about how the prescriptions aren't properly marked. You know what? Those responsible for marking the prescriptions have already been dealt with." In light of the fact that the government had elicited testimony that Vázquez-Senti's co-defendants had pled guilty, this argument was likely to appear as an attempt to suggest to the jury that, just as those individuals were held responsible, now it is appellant's turn.

Furthermore, contrary to the government's argument, appellant's questions on cross-examination concerning the benefits of Vázquez-Senti's cooperation did not open the door to questions about these guilty pleas. The government seems to take the position that any time a defendant explores the benefits that a cooperating witness obtained, it is entitled to introduce evidence about other participants in the conspiracy and deals that they were offered. However, the government offers no authority for this problematic assertion and we find it meritless. Accordingly, the court erred in permitting the government to elicit testimony concerning the guilty pleas of Vázquez-Senti's co-defendants.

That error, however, was harmless. The government presented overwhelming evidence of appellant's guilt at trial, including: 1) extensive testimony from Vázquez-Senti concerning appellant's role in the scheme to obtain drugs by means of medically unnecessary prescriptions, 2) recordings of telephone conversations between appellant and Vázquez-Senti concerning the sale of prescriptions and the lists of names to be used in writing prescriptions, 3) the patient lists provided by appellant to Vázquez-Senti, 4) thousands of prescriptions written by Vázquez-Senti that he testified were medically unnecessary, 5) testimony concerning DEA surveillance of meetings between appellant and Vázquez-Senti, and 6) testimony concerning the seizure of prescription drugs from two individuals in the company of appellant

immediately after a visit to one of the pharmacies at which the medically unnecessary prescriptions were filled.

The inappropriate testimony, even coupled with the government's reference to the guilty pleas in its closing argument, is insignificant when considered against the totality of the evidence presented at trial. Thus, we can conclude "with fair assurance" that the jury's decision was not swayed by the improperly admitted testimony. Walker, 665 F.3d at 231. The error, therefore, was harmless. See United States v. Dunbar, 553 F.3d 48, 59 (1st Cir. 2009) ("The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of trial." (internal quotation marks omitted)).

### 4. Cross-Examination of Vázquez-Senti

Appellant also argues that it was error for the court to refuse to allow him to cross-examine Vázquez-Senti about charges that were dismissed as part of the doctor's plea agreement. The indictment against Vázquez-Senti included one conspiracy count, seven distribution counts, and one forfeiture count. Vázquez-Senti was permitted to plead guilty to only the conspiracy and forfeiture counts. Appellant argues that dismissal of the distribution counts was a benefit that he should have been able to use to impeach Vázquez-Senti. He points out that the plea and cooperation agreement entered into by Vázquez-Senti states that the doctor will

not be charged with "any other crimes committed about which the defendant has informed the United States." However, when appellant attempted to elicit testimony from Vázquez-Senti concerning the dismissed charges, the court upheld an objection and blocked this line of questioning.

It is well established that "the right to cross-examination is not unbridled." United States v. Rivera-Rodriguez, 617 F.3d 581, 591 (1st Cir. 2010) (quoting United States v. Molina, 407 F.3d 511, 523 (1st Cir. 2005)). We have explained that "[s]o long as the trial court affords the defendant a fair opportunity for effective cross-examination, it may impose reasonable restrictions . . . [, and] [t]he trial court's latitude in shaping such restrictions is 'wide.'" Id. (quoting Molina, 407 F.3d at 523). In particular, information concerning pending or dismissed charges against a witness may be unfairly prejudicial. Where the defense is permitted to cross-examine a witness regarding a cooperation agreement with the government, the details of the other charges may not be necessary to establish the potential for bias. See United States v. Bunchan, 580 F.3d 66, 71 (1st Cir. 2009). The ultimate question is whether "the jury is provided with sufficient information concerning formative events to make a discriminating appraisal of a witness's motives and bias." DiBenedetto v. Hall, 272 F.3d 1, 10 (1st Cir. 2001) (internal quotation marks omitted).

Here, the jury was provided sufficient information to make an informed judgment concerning Vázquez-Senti's motives and potential bias. As noted, Vázquez-Senti acknowledged that he was testifying in connection with a plea and cooperation agreement, and the agreement was itself admitted into evidence. It guarantees that Vázquez-Senti will not be prosecuted for other crimes about which he informs the government, provides that he will be held liable for only 745 of the more than 20,000 medically unnecessary prescriptions that he wrote, and states that the government will recommend a sentence of 108 months' incarceration, well below the statutory maximum of twenty years. In short, there is no doubt that the jury was aware of both Vázquez-Senti's incentive to testify against appellant and the potential for bias. Accordingly, it was not an abuse of discretion for the district court to limit cross-examination regarding the dismissed charges.

### 5. Failure to Provide Reports of Investigation

Appellant argues that the district court erred by failing to order the government to provide him two Reports of Investigation ("ROI") prepared in connection with interviews of Vázquez-Senti and the rough notes taken by investigators during those interviews. There were at least three such interviews and three ROIs. At trial, appellant asked the district court to review the ROIs in camera and determine if he was entitled to receive them under the Jencks Act, 18 U.S.C. § 3500. The district court reviewed the ROIs

and determined that two of the three did not have the characteristics of Jencks material, as they were not verbatim records of the interviews and not even prepared on the same days as the interviews they documented. However, it did order the government to turn over the third ROI, which was prepared on the day of the interview. On appeal, appellant asks that we review the two ROIs withheld and determine whether they should have been turned over pursuant to the Jencks Act.

The Jencks Act generally requires that any "statement" of a government witness relating to the subject matter of that witness's testimony be turned over to the defendant. 18 U.S.C. § 3500(b). The Act defines "statement" as:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Id. § 3500(e). We have explained that this definition does not require that a witness write the statement himself, but that notes taken by an investigator during an interview may qualify if read back to the witness and adopted. United States v. Gonzalez-Melendez, 570 F.3d 1, 4 (1st Cir. 2009) (per curiam). "Where a

-18-

defendant requests discovery of potential Jencks material, our precedent requires the district judge to conduct an <u>independent</u> investigation of any such materials and determine whether these materials are discoverable under the Jencks Act." <u>Id.</u> at 3. This independent investigation can take the form of an in camera review of the documents or an evidentiary hearing to take testimony from the witness who provided the purported "statement." <u>Id.</u> at 3 n.2. On appeal, a district court's decision on a Jencks Act claim is reviewed for abuse of discretion, <u>United States</u> v. <u>Gonzalez-Melendez</u>, 594 F.3d 28, 35 (1st Cir. 2010), though we review underlying legal conclusions de novo and findings of fact for clear error, <u>id.</u>

In this case, the district court conducted the requisite investigation, as have we, of the ROIs in question. Like the district court, we do not find the ROIs to be statements within the meaning of the Jencks Act. Contrary to appellant's suggestion, the ROIs are not substantially verbatim accounts of the interviews with Vázquez-Senti, nor do they qualify as "statements" under any other provision of the Jencks Act. 18 U.S.C. § 3500(e). The ROIs are short bullet-point summaries of the interviews of Vázquez-Senti, and there is no indication that they were ever shown or read to Vázquez-Senti, or adopted by him.

Appellant argues that even if he was not entitled to the ROIs, the district court should have also reviewed the rough notes

taken during the interviews with Vázquez-Senti, which served as the basis for the ROIs. At trial, Vázquez-Senti testified that an agent took hand-written notes during the interviews, but that this note-taking was sporadic and only occurred in connection with "some" of his answers. He also testified that he never saw what the agent wrote down and that the agents did not review his answers or their notes with him. Given this testimony, there was plainly no opportunity for Vázquez-Senti to adopt the rough notes as his own statements, nor could the rough notes have been a "substantially verbatim" recording or transcription of the interviews. See id. § 3500(e)(1) & (2). Accordingly, it was not an abuse of discretion for the district court to decline to order the government to produce these documents to appellant as Jencks material.[3]

### 6. Denial of the Rule 29 Motion

At the conclusion of his trial, appellant made a motion pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal. Although the motion is styled as challenging the sufficiency of the evidence supporting his conviction, it actually

---

[3] Appellant is correct that the district court identified an incorrect legal standard when it stated that appellant would be entitled to the ROIs only if "the result of the proceeding would have been different if the evidence had been disclosed." As appellant noted, this is an appellate legal standard unrelated to the identification of Jencks material. However, for the reasons stated, appellant is not entitled to the ROIs under the Jencks Act because they do not constitute "statements" within the meaning of the Act.

-20-

challenges the drug quantity determination made by the jury.[4] According to appellant, this determination was almost entirely based on the five lists of names that Vázquez-Senti testified were used to write prescriptions, and he argues that there was insufficient evidence to link him to the lists. In particular, he argues that: 1) the lists referred to in recorded telephone conversations were different from those introduced as evidence, 2) Vázquez-Senti testified that some of the lists appeared to be written in the handwriting of an ex-wife of appellant, and 3) there was inconsistent evidence concerning the use of the lists because Vázquez-Senti testified that the lists were only used for prescriptions filled at one of the three pharmacies, but many of the prescriptions using names from the lists were filled at the other two. Given that these lists were the link tying him to the 2,700 prescriptions for which he was ultimately held liable, appellant argues that the court erred in denying his motion for a judgment of acquittal.

We review a district court's denial of a Rule 29 motion de novo, "taking the evidence in the light most favorable to the government and making all reasonable inferences in its favor."

---

[4] For the purpose of sentencing after a guilty verdict, the court will often determine the amount of drugs for which a defendant will be held liable. However, it is not unprecedented for the jury to be asked to make a specific drug quantity determination by means of a special verdict form. See United States v. Casas, 356 F.3d 104, 127-28 (1st Cir. 2004).

-21-

United States v. Giambro, 544 F.3d 26, 29 (1st Cir. 2008). Such an analysis requires us to "assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." United States v. Fernández-Hernández, 652 F.3d 56, 67 (1st Cir. 2011).

We reject appellant's argument. At best, he identifies minor inconsistencies in witness testimony which do not outweigh the strong evidence that he did provide the lists to Vázquez-Senti. Given that appellant and his ex-wife worked together to obtain prescription drugs for some time, the fact that the lists may be in his ex-wife's handwriting is consistent with appellant's alleged role in the conspiracy and the attribution of drugs obtained using prescriptions written in names from those lists to him.

Furthermore, although Vázquez-Senti testified at one point that the lists were used at only one of the pharmacies, later that same day he testified that he did not know where the prescriptions were taken to be filled, allowing for the possibility that some of the prescriptions were taken to other pharmacies. Additionally, during the course of the investigation, appellant was observed with several individuals whose names appeared on the lists. Most importantly, Vázquez-Senti testified that appellant provided him the lists and instructed which list to use at a given time, and that he gave appellant the prescriptions he wrote using the lists. This testimony was corroborated by the admission of a

recorded phone conversation between appellant and Vázquez-Senti discussing the use of these lists.[5]  In sum, there was ample evidence to connect appellant to the patient lists and to support use of these lists to determine the drug quantity attributable to him.  Therefore, the court was correct to deny appellant's Rule 29 motion.

## B.  Sentencing Issues

### 1.  Drug Equivalency Ratios

The district court sentenced appellant based on a quantity of drugs determined by use of equivalency tables established by the sentencing guidelines.  Appellant argues on appeal, as he did below, that the equivalency ratio provided for oxycodone is unfairly high and creates unwarranted disparities between defendants sentenced for offenses involving oxycodone and morphine.  The sentencing guidelines instruct that, when determining the base level for an offense, one gram of oxycodone is equivalent to 6,700 grams of marihuana, and one gram of morphine is equivalent to 500 grams of marihuana. USSG § 2D1.1 cmt. n.10(D).  In an objection to the Presentence Report, appellant argued that the court should use the 500-gram equivalency for morphine because

---

[5] Appellant points to this conversation as evidence that he did not prepare the lists because Vázquez-Senti states during the conversation, "Remember that I did list 2, the one that he is supposed to get . . . [a]nd the list 3."  However, read in context, this statement may be understood to mean that Vázquez-Senti had recently written prescriptions using lists two and three, not that he wrote the lists.

the 6,700-gram equivalency for oxycodone created an unwarranted disparity between those convicted of offenses involving the two drugs.  In support, he notes that oxycodone is a morphine derivative and that morphine is more potent and more addictive than oxycodone.  He further argues that the court committed a procedural error by failing to recognize that it had discretion, pursuant to Kimbrough v. United States, 552 U.S. 85 (2007), to impose a variant sentence based on policy disagreements with the guidelines.  See United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009) ("[A]fter Kimbrough, a district court makes a procedural error when it fails to recognize its discretion to vary from the guideline range based on a categorical policy disagreement with a guideline.").

These arguments are without merit.  The court explicitly acknowledged its authority to impose a variant sentence based on a policy disagreement with the guidelines.  At sentencing, appellant invoked Kimbrough and raised what he described as a "fairness argument" based on the respective equivalencies for oxycodone and morphine.  The court agreed that it had discretion under Kimbrough, and asked appellant to "[e]xplain to me why this is a fairness argument."  In fact, at one point appellant stated, "Let's be clear.  You have the authority to disagree [with the guidelines equivalency for oxycodone]," to which the court responded, "Of course. . . .  But why should I disagree?"  Given this exchange, it

is clear that the court was aware that it had discretion to vary from the guidelines range based on a policy disagreement.

Although our review ends here, it is worth noting that the exceptionally high equivalency ratio for oxycodone is the product of a 2003 amendment to the guidelines. See Amendment 657, USSG app. C, vol. II at 397 (2003). As we explained in United States v. Ekasala, 596 F.3d 74 (1st Cir. 2010) (per curiam):

> Amendment 657 changed the marijuana equivalent for oxycodone in two respects. First, it based the equivalent on the amount of actual oxycodone involved rather than on the gross weight of the pills containing oxycodone. Second, it made 1 gram of oxycodone equivalent to 6,700 grams of marijuana, rather than 1 gram of pill weight equivalent to 500 grams of marijuana.

Id. at 75 n.1. Thus, unlike for many prescription drugs, when determining the guidelines range for an oxycodone-related offense, only the weight of the active ingredient (oxycodone) is used, not the full pill weight. This change was made because of proportionality issues arising when "pills containing greatly differing amounts of actual oxycodone had the same marijuana equivalent and, hence, the same base offense level." Id. at 76.

In contrast, in determining the guidelines range for a morphine-related offense, the full weight of the pill or other mixture including morphine is used, regardless of potency. See USSG § 2D1.1(c) n.(A) & cmt. n.1, n.10(D). Accordingly, the apparent disparity caused by the multipliers used for oxycodone and

morphine is largely neutralized by the use of a larger base weight for morphine. See United States v. Vigil, 832 F. Supp. 2d 1304, 1319, 1327-30 (D.N.M. 2011) (discussing at length the guidelines treatment of oxycodone and finding no disparity in treatment of oxycodone and morphine).

## 2. Acceptance of Responsibility

Appellant argues that the court erred in failing to grant him a two-level reduction in offense level pursuant to USSG § 3E1.1(a), which allows such a reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense." Id. Appellant argues that he fully accepted responsibility for his offense, pointing out that he detailed his role in the scheme in a series of interviews with authorities and even offered to cooperate in the investigation of others. He asserts that he rejected the offered plea agreement only because he felt he was being treated unfairly as compared to others convicted in the same scheme, all of whom were offered deals calling for a shorter period of incarceration. He argues that insisting on going to trial under these circumstances is not incompatible with the type of acceptance of responsibility called for by USSG § 3E1.1(a).

A sentencing court's determination of whether a defendant accepted responsibility is reviewed for clear error. United States v. Garrastequy, 559 F.3d 34, 38 (1st Cir. 2009). In order to qualify for a reduction pursuant to USSG § 3E1.1(a), "a defendant

-26-

must truthfully admit or not falsely deny the conduct comprising the conviction, as well as any additional relevant conduct for which he is accountable." Garrastequy, 559 F.3d at 38. Given this requirement, "defendants who proceed to trial and put the government to its proof normally do not qualify for any reduction for acceptance of responsibility . . . [, and] proceeding to trial creates a rebuttable presumption that no credit is available." Id. at 38-39 (citations omitted). However, the guidelines provide that in "rare situations" the reduction may be available to those who go to trial. USSG § 3E1.1 cmt. n.2. Such circumstances include, "for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." Id.

This case does not present one of the "rare situations" in which going to trial is compatible with a § 3E1.1(a) reduction. While it is true that appellant initially acknowledged his conduct to investigators, he did not do so at trial. His defense at trial was not based on issues other than his factual guilt; rather, he disputed every aspect of the government's case and denied his role in the conspiracy. Given this conduct, his reasons for rejecting the government's offered plea agreement are immaterial, and the court did not err in deciding that his decision to go to trial and deny his factual guilt disqualified him from receiving a § 3E1.1(a)

reduction.  See United States v. González-Vélez, 587 F.3d 494, 509 (1st Cir. 2009) (stating that "the failure of plea negotiations is generally not . . . a circumstance" permitting a § 3E1.1(a) reduction for a defendant who chooses to go to trial).

### 3.  Consideration of § 3553(a) Factors

Although appellant's final argument occasionally seems to be a claim that the 240-month sentence imposed was substantively unreasonable, this claim is not actually raised.  Rather, he focuses on two claims of procedural error.[6]  First, he argues that the court erred in determining that it could not consider the extent of his cooperation with the government as a basis for a downward variance in the absence of a USSG § 5K1.1 substantial assistance motion from the government.  Second, he asserts that the court erred in failing to explain why it rejected an argument for a lower sentence based on the disparity between the sentences imposed on him and others convicted as part of the same scheme. See United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010) (noting that procedural error includes "failing to consider

---

[6] We draw a distinction between claims of procedural error in sentencing, such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence," United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)), and claims of substantive unreasonableness, which challenge the reasonableness of the sentence imposed given "the totality of the circumstances," id.

the 18 U.S.C. § 3553(a) factors" or "failing to adequately explain the chosen sentence").

With regard to appellant's first argument, § 3553(a)(1) instructs a sentencing court to consider the "history and characteristics of the defendant," without limitation. As the Second Circuit has explained, "[t]his sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation." United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006). Furthermore, nothing in the guidelines suggests that a court's discretion to consider all of a defendant's relevant conduct under § 3553(a) is constrained by the government's decision not to file a § 5K1.1 motion. Accordingly, we join our sister circuits in sensibly holding that, in determining the appropriate sentence within the guidelines, or in varying from the guidelines, a sentencing court has discretion to consider the defendant's cooperation with the government as a § 3553(a) factor, even if the government has not made a USSG § 5K1.1 motion for a downward departure. See United States v. Massey, 663 F.3d 852, 858 (6th Cir. 2011); United States v. Leiskunas, 656 F.3d 732, 737 (7th Cir. 2011); Fernandez, 443 F.3d at 33; United States v. Doe, 398 F.3d 1254, 1260-61 (10th Cir. 2005); Hutchison, et al., Federal Sentencing Law and Practice § 5K1.1, cmt. 2 n.3 (2012) (noting that although a court may not grant a downward departure for substantial assistance without a

motion from the government, "[p]ost-Booker . . . sentencing courts may weigh a defendant's assistance or attempts to assist the government as part of the § 3553(a) analysis and vary from the Guidelines if appropriate").  No circuit court has held to the contrary.

However, although appellant's legal argument is correct, we detect no error in the district court's assessment of the § 3553(a) factors.  It is true that, during appellant's sentencing hearing, the court initially expressed doubt that it could grant a downward variance based on his cooperation absent a motion pursuant to USSG § 5K1.1.  But the court offered appellant the opportunity to "convince me otherwise."  After appellant identified cases from other circuits holding that a sentencing court has such discretion, the court stated, "I understand your argument.  Thank you."  It went on to hear extensive argument from appellant concerning his cooperation with the government, and also asked the government to address the issue of his cooperation on the merits.  Accordingly, the record indicates that the court understood that it had the discretion to consider the extent of appellant's cooperation in fashioning the appropriate sentence.

Appellant's argument concerning the alleged failure of the district court to explain its rejection of his sentencing disparity argument also fails.  At the sentencing hearing, appellant had ample opportunity to elaborate on the disparity

argument, which had already been raised in his objections to the Presentence Report, and he did so. The gist of this argument was that the others who pled guilty as part of the scheme in which he was involved received far lower sentences. While that is so, appellant ignores important differences between his circumstances and those of the other individuals he identifies. Appellant was considered a leader in the conspiracy and had a more extensive criminal history than some of the other participants. Given that "a sentencing court is not required to address frontally every argument advanced by the parties, nor need it dissect every factor made relevant by 18 U.S.C. § 3553," United States v. Turbides-Leonardo, 468 F.3d 34, 40-41 (1st Cir. 2006), the court did not err by failing to explain why it rejected appellant's disparity argument, especially where that argument was so obviously meritless.

## IV.

For the foregoing reasons, we find appellant's arguments without merit. Although the district court did err in admitting testimony about the guilty pleas of appellant's former co-defendants, that error was harmless. Accordingly, the judgment is affirmed.

So ordered.